No. 98-314

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 301

302 Mont. 350

14 P.3d 1202

STATE OF MONTANA,

Plaintiff and Respondent,

v.

THOMAS SCARBOROUGH,

Defendant and Appellant.

APPEAL FROM: District Court of the Twentieth Judicial District,

In and for the County of Lake,

The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Rebecca T. Dupuis, C. Edward Hayes, Attorneys at Law, Polson,

Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Cregg W. Coughlin,

Assistant Attorney General; Helena, Montana

Kim Christopher, Lake County Attorney; Mitchell A. Young,

Deputy Lake County Attorney; Polson, Montana

Submitted on Briefs: November 4, 1999
Decided: December 5, 2000

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Following a jury trial in the Twentieth Judicial District Court, Lake County, Tom Scarborough was convicted of deliberate homicide, attempted deliberate homicide, and robbery. Scarborough appeals his conviction, alleging certain statements he made to police were improperly admitted at trial, the jury was improperly instructed in the law of mitigated deliberate homicide and a number of other procedural errors. We affirm the District Court in all respects.

## BACKGROUND

¶2 In the early morning of August 27, 1996, Missoula County 911 received an anonymous call reporting a homicide at a house near St. Ignatius. The caller reported seeing Tom Scarborough and his sister-in-law Amy Scarborough load the body of David Willis into the back of a pickup truck. The caller, Ray Morrison (Morrison), indicated that Tom Scarborough attempted to kill him as well.

¶3 Tom Scarborough (Scarborough) suffers from schizophrenia. The symptoms of this disease generally include paranoia, auditory hallucinations, susceptibility to suggestion and an inability to reason and make judgments. Scarborough receives a monthly injection of the anti-psychotic drug Haldol to control his symptoms. A blood test taken shortly after his arrest indicated a concentration of Haldol in Scarborough's blood of three nanograms per milliliter. Experts testified at trial that this level was at the low end of the therapeutic range.

¶4 In 1992, Scarborough voluntarily admitted himself for treatment at the Montana State Hospital. In 1993, Scarborough was readmitted to the Montana State Hospital for psychiatric evaluation following his arrest on charges of felony robbery and misdemeanor drug and paraphernalia possession. This arrest lead to a six-year suspended sentence on the robbery charge. While all of the medical experts who have examined him agree that Scarborough suffers from schizophrenia, many have suggested that he exaggerates his symptoms and uses his schizophrenia as an excuse to avoid responsibility for his actions.

¶5 Raymond Morrison, an itinerant salesman, met Scarborough during the summer of 1996 when he sold his brother Rick Scarborough (Rick) and sister-in-law Amy Scarborough (Amy) a car. In mid-August Morrison picked up a hitchhiker named David Willis (Willis) outside Butte. They traveled together in Morrison's camper, eventually stopping at Rick and Amy's house near Trout Creek on or about August 23, 1996.

¶6 Willis and Morrison partied with the Scarboroughs for about three days. During this time, Amy approached Morrison for a small loan to buy marijuana. When Morrison agreed, she noticed that he took a large sum of money--approximately $1,500--from a drawer in his camper. She remarked "That's a lot of money." Amy later testified that Scarborough and his brother Rick planned to take Morrison and Willis fishing at a "remote location" where Scarborough was going to kill them for Morrison's money.

¶7 This plan failed when Morrison and Willis decided to forget about the loan and leave. As they were packing up, however, Scarborough convinced Morrison to take them to St. Ignatius where he had a house he wanted to clean up in preparation for sale. He had a car there that he would sell to pay back the loan. Morrison reluctantly agreed to take them and, to his surprise, the Scarboroughs immediately began making preparations to leave, despite the fact that it was already late in the evening. Scarborough brought a .22 rifle with him which he said was to kill cats that were living in the house.

¶8 When they arrived in St. Ignatius, Scarborough and Amy wanted Morrison and Willis to sleep in the house. Morrison declined because the house was filthy and his camper was clean and comfortable. Willis said he would sleep outside, as was his usual practice, but Scarborough urged him sleep in the upstairs bedroom, suggesting that the neighborhood was dangerous. Morrison went outside and climbed into the cab-over bed in his camper. When Willis went inside, Morrison could see through the windows of the house that Scarborough and Amy were directing Willis upstairs. They headed up the stairs with Willis behind Amy and Scarborough in the rear, carrying the rifle. Morrison saw

Scarborough bring the rifle up from his waist. As they passed out of view, Morrison heard a bang which he believed was a gunshot. It was followed by another bang a short while later.

¶9 Scarborough then came down the stairs and ran towards the camper. He opened the screen door to the camper and jumped inside, rifle in hand. He placed the rifle on the table, telling Morrison he had just shot a cat in the cellar. Morrison knew this to be a lie because he had seen Scarborough come from upstairs. Scarborough then pointed the rifle at Morrison who slapped the barrel away. The two struggled over he gun. When Morrison grabbed the barrel he felt Scarborough pull the trigger and heard a click but the gun did not fire. When Morrison told Scarborough not to point the gun at him Scarborough said he was "just kidding" and "just messing with him" and that the gun was not loaded. Scarborough offered to go back in the house and get Morrison a beer. Morrison agreed just to get Scarborough to leave.

¶10 Morrison wanted to leave but he was concerned about Willis. He quickly loaded his things and then walked to the front door of the house. He saw the rifle lying on the stove just inside the door. When he opened the bolt of the rifle an unfired bullet popped out of the chamber and rolled onto the stove. He could see that the bullet was a dud because of the firing pin impression on it. The next bullet in the magazine appeared to be jammed in the rifle. When Scarborough saw Morrison with the gun he ran over, grabbed the gun and started working the action. Morrison ran back out of the house and, looking back, saw Scarborough headed up the stairs. Before he reached his truck, Morrison heard another gunshot.

¶11 As he climbed back into his truck, Amy came outside and asked Morrison where he was going. He said that Scarborough had tried to kill him and that he was getting out of there. When he asked her where Willis was, Amy replied that he was asleep. He told her to wake him and send him out. Amy went inside but Morrison could see that she did not go upstairs. When she came back outside she said that Willis was watching TV. Morrison told her he was leaving and drove away but, after a short while, he doubled back, parking where he could still see the house.

¶12 In the meantime, Scarborough had backed up his pickup to the front door of the house. From where he was parked, Morrison watched Scarborough and Amy drag Willis' body from the upstairs bedroom and throw it in the back of the truck. When Scarborough drove off Morrison turned off his headlights and followed Scarborough's pickup. He could see

Willis' body in the back of the truck. When Scarborough slowed and stopped near a bridge over Mission Creek, Morrison sped around him and drove away. He was scared and kept driving until he reached the Clinton rest area, east of Missoula, where he called 911 and reported the incident.

¶13 Amy later testified that Scarborough's pickup had run out of gas near the bridge, that Scarborough dragged Willis' body out of the back of the truck and down along the creek and that Scarborough concocted a story for the police. He told Amy to tell police that Morrison committed the murder and that they were outside working on his pickup when they heard gunshots and saw Morrison run down the stairs and out of the house.

¶14 Following Morrison's 911 call, Lake County Sheriff Joe Geldrich (Sheriff Geldrich) and Lake County Sheriff's Detective Mike Sargeant (Detective Sargeant) were dispatched to the scene. They discovered Scarborough's truck on the Mission Creek bridge. It appeared that someone had thrown dirt on the bed of the truck in an attempt to cover fresh blood. Following drag marks leading from the truck, they found Willis' body hidden in the brush a short distance from the creek. An autopsy revealed that Willis had been shot three times from close range with a .22 caliber rifle. After finding the pickup and Willis' body, the officers went to the house where Scarborough answered the door and invited them in.

¶15 The officers noticed what appeared to be drops of fresh blood on the floor. Sheriff Geldrich asked Scarborough for consent to perform a search. He agreed and accompanied Detective Sargeant to his car to sign a consent form. On the way, Scarborough volunteered that the shooting had occurred in an upstairs bedroom, that the rifle used in the crime was in a garment bag in an upstairs closet and that he had removed the victim's body from the house and disposed of it near the creek. He identified Morrison as the person who shot Willis. After signing the consent form, Scarborough was left to wait in the police car while officers discussed how to proceed. Around this time, Sheriff Geldrich informed Detective Sargeant that Scarborough had a history of mental illness. The officers then decided to obtain a search warrant for the house and Scarborough's truck.

¶16 While they were waiting for the warrants, Detective Sargeant and Lake County Sheriff's Officer Alexander advised Scarborough of his *Miranda* rights and had a second conversation with him. Scarborough repeated his earlier story that Morrison had killed Willis. He told Detective Sargeant that, after he and Amy found the body, he picked up the gun and placed it inside a garment bag in the bedroom closet. He explained that he hid the gun and the body because he was afraid of getting in trouble. Detective Sargeant decided

to obtain a taped statement from Scarborough so he and Officer Alexander took him to the St. Ignatius Police Station.

¶17 The taped interview lasted approximately one hour. Both Detective Sargeant and Officer Alexander were present during the interview but only Detective Sargeant asked questions. Officer Alexander informed Scarborough of his *Miranda* rights which he waived. Scarborough repeated his earlier story implicating Morrison. Detective Sargeant asked Scarborough about his schizophrenia and whether he could have shot Willis during some kind of "blackout." He asked whether it was possible that drugs or alcohol in combination with his medication could have affected Scarborough's recollection of events. Scarborough stated that such things were possible for schizophrenics but he continued to deny that he had shot Willis. Detective Sargeant continued to explore the possibility that Scarborough's illness could have some effect on his actions or recollection of events but never elicited any specific admissions. At the conclusion of the interview, Detective Sargeant placed Scarborough under arrest. Shortly thereafter, he and Officer Alexander transported Scarborough by car to the Lake County Jail. During the drive, Scarborough spontaneously stated "I wish I knew why I shot him," and "maybe someday I will know why I shot him."

¶18 Scarborough was charged with the deliberate homicide of Willis, attempted deliberate homicide of Morrison and robbery. At trial, Scarborough maintained that he shot Willis during a schizophrenic episode and either did not have the requisite mental state for deliberate homicide or had committed the reduced offense of mitigated deliberate homicide. After a jury trial, Scarborough was convicted on all counts. He raises the following issues on appeal:

¶19 1. Did the District Court err when it denied Scarborough's motion to suppress evidence of statements he made to police?

¶20. Did the District Court err when it instructed the jury that it must acquit Scarborough on the Deliberate Homicide charge before considering the affirmative defense of Mitigated Deliberate Homicide?

¶21. Did the District Court err when it denied Scarborough's motion to suppress the psychiatric report of Drs. Van Hassel and Hill?

¶22. Did the District Court improperly comment on the credibility of Scarborough's expert

witness?

¶23. Did the District Court err when it denied Scarborough's motions for a mistrial following testimony regarding his previous criminal history?

¶24. Did the District Court err by failing to consider evidence of mental disease or defect during sentencing as required by § 46-14-311, MCA?

## DISCUSSION

¶25 1. Did the District Court err when it denied Scarborough's motion to suppress evidence of statements he made to police?

¶26 Scarborough made three sets of statements to the police: at the crime scene, at the St. Ignatius Police Station during a taped interview, and in a patrol car while he was being transported from the St. Ignatius Police Station to the Lake County Jail. Only during the last statement did Scarborough indicate that he had committed the murder.

¶27 Scarborough's motion to suppress evidence of "confessions and admissions" covered the statements made during interrogation at the St. Ignatius Police Station and the statements made while in transit to Polson. Both parties submitted proposed findings of fact and conclusions of law. During a two-day hearing, the District Court reviewed the audio tape of Scarborough's interview and heard testimony from both the officer who conducted the interview and mental health experts hired by each party. The District Court then denied Scarborough's motion to suppress.

¶28 Scarborough contends that statements he made to the officers during his interview were involuntary products of psychological coercion. He argues that, as a result of his schizophrenia, he was susceptible to suggestion and any inculpatory statements he made during the interview were "composed" by the interrogating officer. He contends that statements he made while being transported to the Lake County Jail "came on the heels" of the interview and were, thus, also involuntary. The State responds that, although schizophrenics may, in general, be susceptible to suggestion, there was no evidence that Scarborough's statements to police were coerced. Rather, considering the "totality of the circumstances," the State contends that there was ample evidence for the District Court to conclude that Scarborough's statements, both during the interview and afterwards, were freely made. We agree.

¶29 A defendant may move to suppress an admission or confession on the ground that it was given involuntarily. Section 46-13-301(1), MCA. At trial, the prosecution must prove by a preponderance of the evidence that the confession or admission was voluntary. Section 46-13-301(2), MCA. On appeal we review a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. State v. Hayworth, 1998 MT 158, ¶ 20, 289 Mont. 433, ¶ 20, 964 P.2d 1, ¶ 20.

¶30 A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if this Court has a definite or firm conviction that the district court committed a mistake. State v. Loh (1996), 275 Mont. 460, 475, 914 P.2d 592, 601; State v. Hermes (1995), 273 Mont. 446, 449, 904 P.2d 587, 589; State v. Bower (1992), 254 Mont. 1, 7, 833 P.2d 1106, 1110. Substantial evidence requires "more than a mere scintilla of evidence, but may be less than a preponderance of the evidence." Gypsy Highview Gathering System, Inc. v. Stokes (1986), 221 Mont. 11, 15, 716 P.2d 620, 623. Where determination of voluntariness depends upon the credibility of witnesses, this Court must defer to the district court judge who is in a superior position to judge the credibility of those witnesses. State v. Beach (1985), 217 Mont. 132, 151-52, 705 P.2d 94, 106.

¶31 Use of an involuntary confession against a criminal defendant violates the guarantee against self-incrimination as well as the right to due process of law. State v. Davison (1980), 188 Mont. 432, 437, 614 P.2d 489, 492. In determining the voluntariness of confessions, the emphasis is on whether the confession was the product of free choice or compulsion. *Davison*, 188 Mont. at 437, 614 P.2d at 492. This inquiry is a factual question which must take into account the totality of the circumstances. *Loh*, 275 Mont. at 475, 914 P.2d at 601.

¶32 While considering the totality of the circumstances, courts have consistently focused on a number of particularly relevant factors. These include the defendant's age and level of education; the length and method of the interrogation; whether the defendant was advised of his or her *Miranda* rights; the defendant's prior experience with the criminal justice system and police interrogation; the defendant's background and experience; and the defendant's demeanor, coherence, articulateness, and capacity to make full use of his or her faculties. *Loh*, 275 Mont. at 475, 476, 914 P.2d at 601, 602. In addition, a confession or admission extracted by any sort of threat or violence, by the exertion of any improper

influence, or by any direct or implied promises, however slight, has the potential for being involuntary. *Loh*, 275 Mont. at 476, 914 P.2d at 602 (citing State v. Phelps (1985), 215 Mont. 217, 224, 696 P.2d 447, 451).

¶33 A number of factors support the District Court's finding that Scarborough's statements during the interview were voluntary. Scarborough does not dispute that he received ample *Miranda* warnings and that he waived his *Miranda* rights prior to making the statements he seeks to suppress. The presence of timely and complete *Miranda* warnings supports a finding of voluntariness. *Beach*, 217 Mont. at 152, 705 P.2d at 106. At the time of his arrest, Scarborough was thirty-nine years old. He had completed the 11th grade and later obtained a GED. A psychiatric evaluation determined that his IQ was in the average range albeit on the low side of that range. Scarborough also had prior experience with the criminal justice system and police interrogation. The interview itself lasted less than an hour, including two short breaks. Officer Alexander was in the room while Detective Sargeant conducted the interview but he did not speak. The officers did not physically coerce Scarborough at any time and never used any improperly manipulative or threatening interrogation techniques. All of these facts support a finding of voluntariness.

¶34 The single fact that raises doubt about the voluntariness of Scarborough's statements during the interview is his history of mental illness. He contends that, while there was no physical coercion, his statements were the result of psychological coercion. Furthermore, he argues that, as a schizophrenic, he was susceptible to suggestion and his "confession" was not his own but was actually composed by Detective Sargeant.

¶35 As an example of this psychological coercion, Scarborough cites a section of the interview in which Detective Sargeant asks whether it was possible Scarborough's schizophrenia could have affected his actions or recollection of events. While admitting that it was hypothetically possible, Scarborough consistently denies that he shot Willis:

> Q: You mentioned that you had been diagnosed as schizophrenic.
>
> A: Yes.
>
> . . . .
>
> Q: Okay. Another possibility now, and please help me with these possibilities. Is it possible that you could have shot him and not known it?

A: That's possible.

Q: Okay.

. . . .

A: I don't think I did.

. . . .

Q: Is it quite possible that you just don't recall shooting him.

A: If I did, I don't remember it.

Q: Okay. But you, if you did, you don't know why.

A: True.

Q: Okay. If you shot him, would you say that it would be linked to your schizophrenia?

A: It would have to be.

Detective Sargeant clearly suggests the possibility that Scarborough might have committed the homicide under some kind of schizophrenic blackout. The question is whether this kind of suggestion constitutes "psychological coercion" under the particular circumstances of this case. We conclude that it does not.

¶36 A confession obtained under psychologically coercive circumstances is not voluntary. State v. Allies (1979), 186 Mont. 99, 112, 606 P.2d 1043, 1050. In *Allies*, the defendant, a schizophrenic and drug addict, was isolated for more than four hours and subjected to intensive "good cop-bad cop" style interrogation. He was not informed of his *Miranda* rights and was denied access to counsel. Moreover, police interrogators consistently lied to the defendant about the information they had linking him to the crime, denied him food and medical attention and subjected him to a sodium amytal "truth serum" test without benefit of the advice of counsel. In what we then described as "subtle" psychological coercion, officers told the defendant that his problem was not criminal but medical or

psychiatric and told him that he could get help, possibly at the State Mental Hospital. *Allies*, 186 Mont. at 113-14, 606 P.2d at 1050-51. Under these circumstances, we held that Allies' confession was not voluntary. *Allies*, 186 Mont. at 115, 606 P.2d at 1052. However, the hypothetical leading questions asked of Scarborough during the interview, based on general symptoms of schizophrenia, are a far cry from the psychological coercion we found in *Allies*. We conclude that, under the circumstances of this case, this type of questioning does not constitute psychological coercion.

¶37 Scarborough next argues that his "confession" during the interrogation was improperly composed by Detective Sargeant. Scarborough cites Blackburn v. Alabama (1960), 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 in support of his contention that a confession composed by law enforcement officials is not voluntary. While the *Blackburn* Court found that a confession composed by police officers was involuntary, there are important differences between *Blackburn* and the case at hand.

¶38 In *Blackburn*, a deputy actually drafted the confession in narrative form on the basis of answers to questions asked by the several officers present. The defendant then signed this statement two days after the fact. *Blackburn*, 361 U.S. at 204, 80 S.Ct. at 278, 4 L. Ed.2d at 246. However, the manner in which the confession was composed was only one factor in the totality of the circumstances the *Blackburn* Court used to determine that the confession was not the "product of any meaningful act of volition." *Blackburn*, 361 U.S. at 211, 80 S.Ct. at 282, 4 L.Ed.2d at 250. The Court also focused on the fact that at least two psychiatrists testified that the defendant had most probably been insane and incompetent at the time he confessed. *Blackburn*, 361 U.S. at 203, 80 S.Ct. at 278, 4 L.Ed.2d at 246.

¶39 In Scarborough's case, no officer drafted a statement from Scarborough's answers. Furthermore, unlike the defendant in *Blackburn*, Scarborough was competent during the interview. The State's expert witness testified that Scarborough was competent during the interview and that the interview was not coercive, punitive or manipulative. Scarborough's own expert testified that schizophrenia does not necessarily limit a person's capacity to make a voluntary statement. Dr. Rich, Scarborough's psychiatrist, suggested that the accuracy of Scarborough's statements might be questionable, especially if his schizophrenia was being inadequately treated, but he never testified that the interview was coercive. After listening to the tape of the interview, Dr. Virginia Hill testified that Scarborough appeared lucid and cooperative.

¶40 Even if Scarborough could have established that the interview was coercive, he had

not admitted anything inculpatory by the time it had ended. Scarborough continued to assert the fabricated story that Morrison was the killer. Admission of these statements was not prejudicial to his defense. Scarborough's defense at trial was that he committed deliberate homicide during an acute psychotic episode-precisely what he accuses the officer of suggesting to him during the interview. A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial. Section 46-20-701, MCA.

¶41 We find that there exists substantial credible evidence in the record to support the District Court's finding that Scarborough's statements to the police during the interrogation were made voluntarily. The District Court's denial of Scarborough's motion to suppress these statements was not clearly erroneous. Even if statements made during the interview were involuntary, Scarborough made no inculpatory admissions and their introduction into evidence was not prejudicial to his defense.

¶42 Finally, Scarborough implies that his statements following the interrogation that "I wish I knew why I shot him," and "maybe someday I will know why I shot him" came "on the heels" of a custodial interrogation and, therefore, were as coerced as his statements made during the interview, itself. As stated above, we have found that the interview was not coercive. While these final admissions are clearly inculpatory, the record indicates that they were made spontaneously and without compulsion. The District Court's denial of Scarborough's motion to suppress these admissions was not clearly erroneous.

¶43. Did the District Court err when it instructed the jury that it must acquit Scarborough on the Deliberate Homicide charge before considering the affirmative defense of Mitigated Deliberate Homicide?

¶44 Scarborough was charged with deliberate homicide and attempted deliberate homicide. At trial he asserted the affirmative defense of *mitigated* deliberate homicide and *mitigated* attempted deliberate homicide; admitting that he committed the crimes but contending that he did so under extreme emotional stress for which there is a reasonable explanation or excuse. Prior to settlement of instructions, the State offered an instruction that directed the jury that it must first acquit Scarborough of deliberate homicide before they could consider mitigated deliberate homicide:

> The defendant is charged in Count I with Deliberate Homicide. In your deliberations you should consider the charge of Deliberate Homicide first, and that all twelve (12)

of you find the defendant either guilty, not guilty by reason of mental disease or defect, or not guilty of that charge.

In the event you find the defendant guilty of Deliberate Homicide, or not guilty by reason of mental disease or defect, you need go no further on Count I and shall proceed to Count II.

In the event you find the defendant not guilty of Deliberate Homicide in Count I, you must then consider the reduced offense of Mitigated Deliberate Homicide. All twelve (12) of you must then find the defendant guilty, not guilty by reason of mental disease or defect, or not guilty of this charge. When you have done so, you have reached a verdict on Count I and shall then proceed to Count II. The defendant cannot be convicted of both Deliberate Homicide and Mitigated Deliberate Homicide.

¶45 This instruction was a modified version of Montana Criminal Jury Instruction No. 1-011 (1990), which is intended to instruct juries on the relationship between a charged offense and any lesser included offenses. The jury received a similar instruction for the attempt charge. Over Scarborough's objection, the District Court adopted these as its Instructions Nos. 14 and 15.

¶46 On appeal, Scarborough argues that by requiring the jury to reach a verdict on deliberate homicide before considering mitigated deliberate homicide these instructions effectively preclude the jury from considering his affirmative defense. The State does not argue the correctness of the instructions but contends that Scarborough was not prejudiced by any error because Scarborough offered no evidence to support a finding that he committed the crimes while under the influence of extreme mental or emotional stress. We agree with Scarborough that Instruction Nos. 14 and 15 were incorrect statements of the law. However, we conclude that this error provides an insufficient basis to reverse Scarborough's conviction for deliberate homicide.

¶47 We review jury instructions in criminal cases to determine whether the instructions, as a whole, fully and fairly instruct the jury on the applicable law. State v. Patton (1996), 280 Mont. 278, 286, 930 P.2d 635, 639 (citing State v. Brandon (1994), 264 Mont. 231, 237, 870 P.2d 734, 737). However, to constitute reversible error, the district court's ruling on the jury instructions must prejudicially affect the defendant's substantive rights. State v. Beavers, 1999 MT 260, ¶ 33, 296 Mont. 340, ¶ 33, 987 P.2d 371, ¶ 33 (citing State v.

Goulet (1997), 283 Mont. 38, 41, 938 P.2d 1330, 1332; State v. Bradley (1995), 269 Mont. 392, 395, 889 P.2d 1167, 1168).

¶48 A person commits the offense of deliberate homicide when he or she "purposely or knowingly causes the death of another human being." Section 45-5-102(1), MCA. A defendant can be convicted of *mitigated* deliberate homicide when he or she purposely or knowingly causes the death of another human being, but does so under the influence of extreme mental or emotional stress for which there is a reasonable explanation or excuse. Section 45-5-103(2), MCA. As should be clear from this statutory language, a finding that the defendant satisfied the elements of deliberate homicide is a *prerequisite* to a conviction on the mitigated offense.

¶49 The District Court instructed the jury to consider Scarborough's affirmative defense of mitigated deliberate homicide only *after an acquittal* on the deliberate homicide charge; that is, only after finding that Scarborough *did not* purposely or knowingly cause the death of another human being. However, there is no logical way the jury could *acquit* on deliberate homicide and then consider mitigated deliberate homicide. To do so would require finding, first, that the defendant *did not* "purposely or knowingly cause the death of another human being." and, second, that he *did so* but only under the influence of extreme mental or emotional stress.

¶50 Likewise, there is no way, under these instructions, that the jury could *convict* on deliberate homicide and then consider mitigated deliberate homicide. In the event that they found the defendant guilty of deliberate homicide, Instruction 14 required the jury to "go no further on Count I and proceed to Count II." Under this instruction a finding that Scarborough purposely and knowingly killed another human being *precluded* consideration of the next step; whether the acts were committed under the mitigating circumstances of extreme mental or emotional stress. In either case, whether the jury found sufficient evidence to convict on deliberate homicide or not, the instructions effectively precluded consideration of Scarborough's affirmative defense. As such, they did not fully and fairly instruct the jury on the applicable law.

¶51 Our task, then, is to consider whether this error prejudicially affected Scarborough's substantive rights. We conclude that it did not. We find no evidence in the record that Scarborough met the burden of proof required for his affirmative defense and conclude that the "acquittal first" instruction could have had no effect on the outcome of the trial.

¶52 Mitigated deliberate homicide is an affirmative defense. Section 45-5-103(2), MCA (1995). To establish this defense, the defendant must prove, by a preponderance of the evidence, that he acted under the influence of extreme mental or emotional stress. Section 45-5-103(2), MCA. A preponderance of the evidence is such evidence that, when weighed against opposing evidence, establishes the elements of the defense as more probably true than not. *See* 2 McCormick on Evidence § 339 (4th ed. 1992).

¶53 Scarborough contends that extensive evidence exists to support his affirmative defense of mitigation. To support this contention he cites testimony of his psychological expert, Dr. Rich who, Scarborough asserts, "concluded that 'there is every reason to believe that [Scarborough's] schizophrenia would have played a very significant role' in the commission of the offenses." A review of the transcript reveals, however, that Dr. Rich did not testify that Scarborough committed the acts while under the influence of extreme mental or emotional stress. Rather, he offered general statements on the impact schizophrenia has on those who suffer from it. He declined to make any specific conclusion about the role of Scarborough's schizophrenia in the crimes and never gave a professional opinion about mental or emotional stress. During a direct examination on Scarborough's capacity to form the mental state of purposely or knowingly, Dr. Rich testified to the general effect that schizophrenia has on those who suffer from it:

> Q. [Mr. Hayes, Counsel for Scarborough]: And do you believe . . . that [Scarborough's] schizophrenia may have played a role or influenced his actions?
>
> A. [Dr. Rich]: Well, I know that schizophrenia really interferes in so many things. I talked earlier about the higher levels of what we call executive functions and judgment and abstract reasoning. And schizophrenia just plays havoc with an individual's ability to figure something out and to know what's the right thing to do.
>
> They tend to act impulsively and tend to have difficulty in looking ahead and to thinking about what are my options and "If I do this, this will happen. And if I do that, then what will be the outcome of those kinds of things." So, yes, I think that there is every reason to believe that his schizophrenia would have played a very significant role *somehow*. [Emphasis added.]

Scarborough cites the preceding testimony as support for his contention that he murdered Willis while under the influence of extreme mental or emotional stress. However, Dr. Rich's next sentence makes clear that his testimony in no way supports this contention:

[Dr Rich]: Now, the reason for my hesitation was that . . . it just seems to me there are so many variations on really what might be the truth at this point it's hard for me to be any more specific than what I just said about it interfering.

¶54 Contrary to Scarborough's assertion on appeal, Dr. Rich never testified to anything more than the fact that schizophrenics generally suffer from a variety of mental impairments and that these may have played some, nonspecific, role in Scarborough's actions. He did not testify that Scarborough suffered from extreme mental or emotional stress or that he acted under its influence when he murdered Willis or attempted to murder Morrison.

¶55 In contrast, the State presented substantial evidence that Scarborough's actions were not committed under the influence of extreme mental or emotional stress. The State's expert witnesses concluded that Scarborough was not acting under the influence of psychotic motivation at the time of the murder. Both Amy and Morrison testified that Scarborough committed the crimes in a planned, calculated and deliberate manner with the purpose of robbing Morrison. Scarborough's own statements to the police following the murder, first blaming Morrison and then admitting the murder, lend additional credence to the State's position.

¶56 The defense of mitigation requires Scarborough to prove by a preponderance of the evidence that he committed deliberate homicide while *actually under the influence* of some extreme mental or emotional stress, not simply that he and other schizophrenics suffer from emotional problems in general. Scarborough did not meet this standard of proof. Not only did he fail to present sufficient evidence to overcome the clear and substantial evidence offered by the State, he provided no evidence to establish the elements of his affirmative defense as more probably true than not. Therefore, we conclude that the "acquittal first" instruction could have had no prejudicial effect on the outcome of the trial. The District Court's ruling on Instruction Nos. 14 and 15, while incorrect, does not constitute reversible error. We affirm.

¶57 3. Did the District Court err when it denied Scarborough's motion to suppress the psychiatric report of Drs. Van Hassel and Hill?

¶58 Prior to trial, Scarborough asked the court to order an evaluation of his mental condition pursuant to § 46-14-202, MCA. The purpose of the exam was to determine whether, because of mental disease or defect, Scarborough was competent to assist with

his defense and whether he had the capacity to act purposely or knowingly at the time of the crime. The District Court granted Scarborough's motion and ordered him transported to Montana State Hospital in Warm Springs where he was examined by Dr. John Van Hassel, Staff Psychologist, and Dr. Virginia Hill, Staff Psychiatrist (Van Hassel and Hill). As part of their examination, Van Hassel and Hill reviewed the State's files on the Scarborough investigation. Their report to the District Court concluded that Scarborough was probably not responding to psychotic motivation at the time of the crime, that he had the capacity to act knowingly and purposely and that he was capable of assisting in his defense. Copies of the report were filed with the District Court and made available to both parties.

¶59 In December, 1996, shortly after Van Hassel and Hill filed their report, Scarborough's counsel moved the District Court for a second mental exam. They based this motion on their continued "concern regarding the Defendant's fitness to proceed and his capacity to have the requisite mental state at the time of the alleged offense." The State did not oppose this motion and a second exam was conducted by Dr. Susan Sachsenmaier.

¶60 In April of 1997, the State requested an evaluation of Scarborough by its own expert, Dr. William Stratford, pursuant to § 46-14-204, MCA. Scarborough objected, arguing that the State should be limited to the evaluation conducted by Van Hassel and Hill at the Montana State Hospital. He reasoned that, because they had access to information collected by the State during the course of its investigation, Van Hassel and Hill were acting as the State's expert witnesses. The District Court overruled the objection and granted the State's motion. In October, 1999, Scarborough renewed his objection to the State's examination with a "motion to suppress" the testimony of Van Hassel and Hill. The District Court denied this motion.

¶61 Scarborough contends that the District Court erred when it allowed the State to have Scarborough examined by its chosen expert and when it denied his motion to suppress the evaluation made by Van Hassel and Hill. In the first case, he argues that because Van Hassel and Hill reviewed State files as part of their investigation, the State should have been forced to adopt their report as its own. By granting the State's motion for an examination by Dr. Stratford and later admitting the testimony of Van Hassel and Hill, Scarborough argues that the State was allowed two psychological evaluations to his one. He contends that this "stacking of the deck" denied him a fair opportunity to present his mental disease or defect defense. The State responds that Scarborough, in fact, presented the testimony of two expert witnesses at trial and there was no unfairness. After a careful

review of the record we conclude that, while there may have been some minor mistakes in the way evaluations were ordered, there was no unfairness. We affirm.

¶62 The District Court's decision to allow evaluation of the defendant by the State's expert, pursuant to § 46-14-204, MCA, presents a question of law which we review for correctness. Carbon Co. v. Union Reserve Coal Co. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686. We treat the District Court's denial of Scarborough's motion to suppress the testimony of Drs. Van Hassel and Hill as a ruling on the admissibility of evidence. Our standard of review for a district court's evidentiary rulings is abuse of discretion. Busta v. Colombus Hosp. Corp. (1996), 276 Mont. 342, 353, 916 P.2d 122, 128. Absent a showing of such abuse we will not overturn the district court's decision.

¶63 Once the issue of the defendant's fitness to proceed has been raised by the defense, the prosecution, or the court itself, the court must designate a qualified individual to examine and report upon the defendant's mental condition. Section 46-14-202, MCA. The report must include an opinion as to whether the defendant suffers from a mental disease or defect and, if so, whether the defendant has the capacity to understand the proceedings against him and assist in his defense. Sections 46-14-206(1)(a) through (c), MCA. In addition, when directed by the court, the report may also include an opinion as to the defendant's capacity to have whatever mental state that is an element of the charged offense. Section 46-14-206(1)(d), MCA. The State is entitled to a separate examination of the defendant by its chosen expert but only after the defense either "discloses the report of the examination to the prosecution or files a notice of the intention to rely on a defense of mental disease or defect." Section 46-14-204, MCA. The defense must provide this notice of intent within ten days of receiving the psychological report. Section 46-15-323, MCA.

¶64 The Van Hassel and Hill report was disclosed directly to the prosecution by the Montana State Hospital. Both parties received copies on or about November 7, 1996. Scarborough received the first part of his second evaluation, by Dr. Sachsenmaier, on or about April 30, 1997. Under § 46-14-204, MCA, Scarborough should have provided notice of his intent to rely on a mental disease or defect defense within ten days of his receipt of the Sachsenmaier report--approximately May 10, 1997. Scarborough actually filed his notice on October 3, 1997. Therefore, at the earliest, the State was entitled to an independent exam on May 10, 1997, the date by which Scarborough should have filed his intent to rely on a defense of mental disease or defect. As we noted above, the District Court granted the State's motion for an independent examination on April 30, 1997, before Scarborough either disclosed Dr. Sachsenmaier's report or filed his notice. We conclude,

therefore, that the District Court erred when it authorized the State to conduct an independent evaluation on April 30, 1997. Nonetheless, we hold that Scarborough was not prejudiced by this error.

¶65 Scarborough's claim of prejudice is based on the premise that the State should have been required to adopt the Van Hassel and Hill evaluation as its own. Then, counting the Van Hassel and Hill report as the State's, he rests his claim of unfairness on the State's opportunity to present two experts to his one. He argues that admitting the Van Hassel and Hill report, in addition to that of Dr. Stratford, gave the State an unfair advantage during the confession suppression hearings and at trial. We disagree.

¶66 We can find no basis in law for Scarborough's argument that the State was bound by the Van Hassel and Hill report. First, this evaluation was requested by Scarborough, himself. Second, use of State files does not convert the evaluation from one requested by the defense to one requested by the State. Section 46-14-202(3), MCA, provides "in the examination, any method may be employed that is accepted by the medical or psychological profession for the examination of those alleged to be suffering from mental disease or defect." Scarborough's own medical expert, Dr. Joseph Rich, testified that he requires all witness statements and police reports in order to perform his evaluations. This is exactly what the State provided. There is no suggestion in the record, and Scarborough does not argue, that the State provided only selected information or otherwise attempted to influence the content of the evaluation. Rather, consistent with its standard procedure in these cases, the State provided Van Hassel and Hill with its entire file to use as their professional judgment saw fit. Consequently, we find no justification for attributing the Van Hassel and Hill report to the State.

¶67 Scarborough's claim of resulting unfairness also lacks merit. Not only does he provide no legal authority for his position, but the record refutes his factual assertion that the State had more expert witnesses. Scarborough had two separate evaluations by defense experts; Dr Sachsenmaier and Dr. Rich. Thus, even attributing the Van Hassel and Hill evaluation to the State, Scarborough had the benefit of an equal number of pretrial evaluations. Nor did the State have more expert witnesses at trial. Scarborough called both Dr. Rich and Dr. Sachsenmaier. The State called Dr. Stratford as its sole expert witness and used the results of the Van Hassel and Hill report during its cross-examination of Dr Rich.

¶68 We can find no factual or legal basis for Scarborough's claim that he was denied the opportunity to present his mental disease or defect defense. While there may have been

some minor errors in the timing of the State's evaluation, we find no prejudice to Scarborough from that error. In addition, Scarborough has made no showing that the District Court abused its discretion when it denied his motion to suppress the Van Hassel and Hill report. Absent that showing, we must affirm the District Court's ruling.

¶69 4. Did the District Court improperly comment on the credibility of Scarborough's expert witness?

¶70 One of Scarborough's expert witnesses, Dr. Susan Sachsenmaier, testified that Scarborough had no recollection of events during the night of the murder. To rebut this testimony, the State questioned her about the detailed and specific account Scarborough reported to her during his psychological interview. Throughout this cross-examination, Dr. Sachsenmaier was argumentative with both the court and the prosecutor, avoiding direct questions and attempting to testify about Scarborough's reported hallucinations. Her failure to respond prompted an exchange between the prosecutor and the witness to limit her answers to the questions asked. When the witness continued to be non-responsive, the District Court admonished Dr. Sachsenmaier to "please answer the question asked of you and only the question asked of you so we can finish sometime."

¶71 When questioning resumed, the prosecutor continued to ask questions about whether Scarborough had reported certain specific actions on the night of the murder. Dr. Sachsenmaier continued to testify with nonresponsive answers about hallucinations. This led to an exchange between counsel and an objection that the prosecutor was being argumentative. In overruling this objection, the District Court stated "[i]t is argumentative but the witness is being most difficult."

¶72 Scarborough contends that the two statements "so we can finish sometime" and "the witness is being most difficult" were improper comments on the credibility of his main expert witness and undermined his right to present a defense of mental disease or defect. He claims that he made no objection to the judge's comments at trial because of the "harsh tenor of the exchange between Dr. Sachsenmaier and the trial judge, the ineffectiveness of any curative instruction, and a practical consideration that defense counsel may alienate the jury . . . by objecting to the trial judge." The State points out that these excuses do not relieve defense counsel from the obligation to object at trial. The State argues that no objection was made to these comments at the time and, therefore, the issue has been waived. We agree.

¶73 Our review of alleged error is limited by statute and the common law doctrine of plain error review. This Court may review the verdict or decision and any alleged error *objected to* which involves the merits or necessarily affects the judgment. Section 46-20-104(2), MCA (emphasis added). "Failure to make a timely objection during trial constitutes a waiver of the objection . . . ." Section 46-20-104(2), MCA. This Court also recognizes a common law plain error doctrine that, under certain narrow circumstances, permits review of alleged errors not objected to at trial. State v. Finley (1996), 276 Mont. 126, 132-38, 915 P.2d 208, 212-15.

¶74 The purpose of stating an objection at trial is not merely to allow the district court to correct itself, if warranted by the circumstances, but to preserve the issue for appellate review. This Court has made it clear that where a defendant does not object at trial to the remarks and conduct of the trial judge, the issue will not be considered upon appeal. State v. Martin (1987), 226 Mont. 463, 467-68, 736 P.2d 477, 480. In *Martin*, the defense argued that its failure to object at trial to comments made by the judge was based on the fear that an objection would have created more prejudice on the part of the jury. We held that this view does not relieve the obligation of counsel to object at trial. *Martin*, 226 Mont. at 467-68, 736 P.2d at 480.

¶75 Conceding his failure to make a timely objection, Scarborough asks us to review the issue under the common law doctrine of plain error. In *Finley*, we held that this Court may, at its discretion, review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made at trial. We made clear, however, that this exception is only available in exceptional circumstances and where failure to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial proceedings, or may compromise the integrity of the judicial process. *Finley*, 276 Mont. at 137, 915 P.2d at 215. In determining the applicability of the common law plain error doctrine, we consider the totality of the circumstances of each case. *Finley*, 276 Mont. at 134, 915 P.2d at 213.

¶76 We find no basis in the record to apply the common law plain error exception to § 46-20-104(2), MCA. Even if the statements made by the District Court could be construed as commentary on Dr. Sachsenmaier's credibility, refusal to address Scarborough's claim will not result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial, or compromise the integrity of the judicial process. Therefore, we decline to review this issue under the common law plain error doctrine.

Whatever his rationale for doing so, Scarborough failed to preserve the issue for appeal by making a timely objection to the District Court's comments as required by § 46-20-104(2), MCA. Consequently, we hold that Scarborough has waived his right to contest this issue on appeal.

¶77 5. Did the District Court err when it denied Scarborough's motions for a mistrial following testimony regarding his previous criminal history?

¶78 Prior to trial, Scarborough filed a motion *in limine* to preclude introduction of prior crimes evidence. The State acquiesced in this motion stating that it had no intention of raising the defendant's prior criminal history during its case-in-chief. On the first day of trial, Morrison, testifying for the State, inadvertently disclosed that Scarborough was on probation. Counsel for the State had been leading the witness through the events of the night of the crime when, in response to the State's question: "What did you do then?" Morrison gave the following answer:

> A. [Morrison]: I got in the truck. And then Amy came out the door. And I said - she came up to the window and she said, "Where are you going?" And I said, "I'm getting out of here. I think your brother-in-law tried to kill me." And she said, "*Oh, he's on probation and stuff.* He's not even suppose to have a gun." I said, "I don't care." [Emphasis added.]

Scarborough objected and moved for a mistrial, claiming that evidence of his probation violated the court's order excluding prior crimes testimony and irrevocably tainted the proceeding. After hearing arguments in chambers, the District Court denied the motion for mistrial and issued the following curative instruction:

> Ladies and gentlemen of the jury, shortly before we recessed yesterday afternoon, the witness Raymond Carl Morrison testified that Amy Scarborough said that the defendant was on probation and was not suppose to have guns. You are instructed that there is no evidence in this case to support such a statement and you are to disregard it.

¶79 Later, the fact that Scarborough was on probation was put before the jury a second time. As part of its case-in-chief the State sought to introduce the audio recording of Scarborough's interrogation at the St. Ignatius Police Station. Without objection by defense counsel, the tape was admitted and played for the jury. In this recording,

Scarborough explains that he hid Willis' body to avoid getting into trouble. The tape contains the following passage:

> Q. [Det. Sargeant]: Why did you think you were going to get in trouble?

> A. [Scarborough]: I've been in trouble before. I'm on probation. I'm not sure why we did what we did.

Scarborough again moved for a mistrial, based on violation of the pre-trial order *in limine*. The District Court again denied the motion. This time, because the defense had failed to object and because it was Scarborough's own sworn testimony, the court declined to offer a curative instruction.

¶80 Scarborough argues on appeal that Amy's statement, testified to by Morrison, that he was on probation and the introduction of Scarborough's own sworn statement to that effect during his police interrogation, fatally prejudiced the jury and made a fair trial impossible. The State responds that Scarborough's motions for a mistrial were properly denied. In the first instance, Morrison's statement was inadvertent and properly dealt with by the court through its curative instruction. In the second instance, although aware of the contents of the taped interview, Scarborough failed to object to its admission into evidence. We conclude there was no reasonable possibility that testimony of Scarborough's probation contributed to his conviction and affirm the ruling of the District Court on both motions for mistrial.

¶81 This Court reviews a grant or denial of a motion for mistrial to determine whether the district court abused its discretion. Harding v. Deiss, 2000 MT 169, ¶ 19, 3 P.3d 1286, ¶ 19, 57 St.Rep. 696, ¶ 19; State v. Soraich, 1999 MT 87, ¶ 17, 294 Mont. 175, ¶ 17, 979 P.2d 206, ¶ 17; State v. Partin (1997), 287 Mont. 12, 17-19, 951 P.2d 1002, 1004-05. A district court's determination of whether to grant a motion for a mistrial must be based on whether the defendant has been denied a fair and impartial trial. *Harding*, ¶ 19; *Partin*, 287 Mont. at 16, 17, 951 P.2d at 1004-05. The general rule is that, where there is a reasonable possibility that inadmissible evidence might have contributed to the conviction, a mistrial is appropriate. *Partin*, 287 Mont. at 18, 951 P.2d at 1005-06. In determining whether a prohibited statement contributed to a conviction, we consider the strength of the evidence against the defendant, the prejudicial effect of the testimony and whether a cautionary jury instruction could cure any prejudice. *Partin*, 287 Mont. at 18, 951 P.2d at 1005-06.

¶82 In *Partin*, we held that inadvertent testimony of a defendant's prior arrest was sufficiently prejudicial to warrant a mistrial. *Partin*, 287 Mont. at 22, 951 P.2d at 1008. Partin was convicted of forgery after the State's handwriting expert inadvertently testified about his prior arrest record. On appeal we reversed, basing our decision on the "inherently prejudicial" effect of defendant's prior arrests in light of the generally "weak and conflicting evidence" against Partin. *Partin*, 287 Mont. at 20, 21, 951 P.2d at 1007. Where evidence of guilt was more compelling, we have upheld a district court's denial of a motion for a mistrial following inadvertent introduction of prior crimes evidence. State v. Ford (1996), 278 Mont. 353, 361, 926 P.2d 245, 249; State v. Walker (1996), 278 Mont. 346, 353, 930 P.2d 60, 64. In both of these cases we held that, in light of the overwhelming evidence of guilt, general references to the defendants' prior criminal history did not contribute to their convictions.

¶83 Based on our holdings in *Ford* and *Walker*, and in light of the overwhelming evidence of Scarborough's guilt, we find that there is no reasonable possibility that inadvertent admission of Scarborough's probation contributed to his conviction. Both Morrison and Amy testified that Scarborough murdered Willis and attempted to murder Morrison. Overwhelming physical evidence linked Scarborough to the crimes. Scarborough himself admitted the killing when he told police "I wish I knew why I shot him." Set against this evidence, we find that testimony of Scarborough's probation could have had little prejudicial effect.

¶84 The possibility that Scarborough was prejudiced by testimony of his probation is further reduced by the nature of his defense. Prior crimes evidence is prejudicial because of the danger that a jury may determine the defendant's guilt or innocence on the basis of past acts rather than evidence related to the charged offense. Scarborough's primary defense was not that he did not commit the acts but, rather, that he did so under the influence of extreme mental or emotional stress or that he did so but lacked the required mental state to be found guilty of deliberate homicide and attempt. Under these circumstances, we find little danger that Scarborough's defense, based not on commission of the criminal acts but on issues of mental state and mitigating circumstances, could have been prejudiced by evidence of his probation.

¶85 Based on the record before us, we conclude that there was no reasonable possibility that references to Scarborough's probation might have contributed to his conviction or so prejudiced the jury as to deny Scarborough a fair and impartial trial. We hold, therefore, that the District Court did not abuse its discretion when it denied Scarborough's motions

for a mistrial.

¶86 In conjunction with the issue of prior crimes evidence, Scarborough argues that the District Court improperly modified its pretrial order *in limine* when it allowed the State to cross-examine Scarborough's expert witness on the criminal acts that prompted Scarborough's 1993 psychological exam. He cites State v. Doll (1985), 214 Mont. 390, 397, 692 P.2d 473, 476, for the proposition that "the purpose of pretrial orders is to prevent surprise and permit counsel to prepare their case for trial on the basis of the pretrial order" and that "modification of a pretrial order regarding the admissibility of evidence three days into trial constitutes reversible error."

¶87 Scarborough's reliance on *Doll* is misplaced. First, we find no evidence in the record that the District Court "modified" its pretrial order *in limine*. Rather, it allowed the State to cross-examine Scarborough's witness on information that she relied on to develop her opinion. Scarborough, himself, opened the door to prior bad acts when his expert witness based her opinion on the circumstances of Scarborough's 1993 robbery conviction. *Doll* addresses a completely different situation; one in which a trial court first excluded other crimes evidence and then allowed the State to introduce such evidence *during its case-in-chief*. Scarborough can hardly claim "surprise" and inability to "prepare his case for trial" when it was his own witness who opened the door to this evidence. Therefore, we find no merit in Scarborough's claim that the District Court improperly modified its pretrial order excluding prior crimes evidence.

¶88 6. Did the District Court err by failing to consider evidence of mental disease or defect during sentencing as required by § 46-14-311, MCA?

¶89 The District Court sentenced Scarborough to life in prison without parole on both Counts I and II, deliberate homicide and attempted deliberate homicide. On Count III, robbery, the District Court sentenced Scarborough to 40 years. Each count carried an additional ten-year sentence enhancement for use of a weapon and all were to run consecutively. Scarborough claims that this sentence is improper because the District Court failed to first consider whether a mental disease or defect rendered him unable to conform his behavior to the requirements of the law as required by § 46-14-311, MCA, and thereby failed to apply the proper sentencing guidelines of § 46-14-312(2), MCA.

¶90 This Court reviews a criminal sentence for legality only. State v. Montoya, 1999 MT 180, ¶ 15, 295 Mont. 288, ¶ 15, 983 P.2d 937, ¶ 15. Thus, our review is confined to

whether the sentence is within the parameters provided by statute.

¶91 Whenever a criminal defendant claims to have suffered from a mental disease or defect at the time of the offense, the sentencing judge must consider any relevant evidence presented at trial, along with any additional evidence considered necessary, to determine if that mental disease or defect "rendered the defendant unable to appreciate the criminality of [his] behavior or to conform [his] behavior to the requirements of law." Section 46-14-311, MCA. Upon such a finding, the district court *may* ignore any minimum sentence prescribed by law for the offense and *must* sentence the defendant to the custody of the Department of Public Health and Human Services for placement in an appropriate correctional or mental health facility. Section 46-14-312(2), MCA.

¶92 Scarborough claims that, instead of making the independent findings required by § 46-14-311, MCA, the District Court merely adopted the jury's finding that Scarborough did not lack the capacity to act purposely or knowingly by reason of mental disease or defect. He implies that, had it not been for this error, he properly would have been sentenced under the guidelines of § 46-14-312(2), MCA. We disagree.

¶93 The District Court clearly stated:

> With respect to the defendant's request . . . , that the defendant be sentenced pursuant to 46-14-312 and 46-14-311, that would require a finding by the Court that the defendant was suffering from a mental disease or defect that rendered the defendant unable to appreciate the criminality of the defendant's behavior or to conform the defendant's behavior to the requirements of the law. The Court cannot so find.
>
> The jury found, and the Court concurs, that the defendant acted knowingly and purposely. The Court heard conflicting testimony from all three psychiatrists and psychologists. And the jury was afforded the opportunity of acquitting the defendant or finding him not guilty by reason of mental disease or defect and did neither. And, in lieu thereof, found that the defendant acted knowingly or purposely and found him guilty. The Court sees no reason to interfere with that finding and, in fact, concurs with those findings.

Scarborough focuses on references to the jury's findings within this passage as indicative of the District Court's wholesale adoption of those findings for its own. It is clear,

however, that the District Court, independently considered the issue and, like the jury, concluded that Scarborough did not suffer from a mental disease or defect. We find that the District Court complied with the requirements of § 46-14-311, MCA, and conclude, therefore, that the sentence was not improper.

¶Based on our review of the record and the foregoing analysis we affirm the District Court's ruling on all issues.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER