No. 03-179

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 298

STATE OF MONTANA,

> Plaintiff and Appellant,

v.

ALAN REAVLEY,

> Defendant and Respondent.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDC 2002-112(A),
Honorable Thomas M. McKittrick, Presiding Judge

COUNSEL OF RECORD:

> For Appellant:

> > Brant Light, County Attorney, Great Falls, Montana

> > Honorable Mike McGrath, Attorney General, Helena, Montana

> For Respondent:

> > Channing Hartelius and Jeffrey Sutton, Hartelius, Ferguson, Baker &
Kazda, Great Falls, Montana

Submitted on Briefs:  August 21, 2003

Decided:  October 30, 2003

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 The State appeals the District Court's suppression of statements Alan Reavley (Reavley) made to law enforcement authorities and of a recorded conversation between Reavley and Mary Klesh (Klesh). We reverse.

¶2 The two issues on appeal are as follows:

¶3 1. Whether the District Court erred in granting Reavley's motion to suppress the statements that Reavley made to law enforcement?

¶4 2. Whether the District Court erred in granting Reavley's motion to suppress the recorded conversation between Reavley and Klesh?

### Factual and Procedural Background

¶5 Following a suppression hearing, the District Court granted Reavley's motions to suppress both the statement he gave to law enforcement authorities and the recorded conversation with Klesh (Reavley's former girlfriend). Because this case comes before us without having yet gone to trial, it is not appropriate that we set forth the case facts any more than is sufficient to resolve the legal issues raised.

¶6 Jim and Lois Arrotta were murdered on September 4, 1964, at the Super Save grocery store where Jim was manager. Approximately two weeks before the night of the murders, store employee Reavley was fired after admitting stealing money and gifts from the store. Reavley was a suspect at the time of the murders. He was never cleared of suspicion. In 2001, the police department reopened the Arrotta murder investigation. Reavley was considered a suspect.

2

¶7    The police contacted Reavley to schedule an interview with him. Reavley chose the date and time of the interview. Exactly thirty-seven years after the murders, on September 4, 2001, Reavley drove to the police department and was questioned about the homicides. The interview lasted a total of approximately four and one-half hours. Several breaks were taken during the interview. Reavley was offered food and coffee. Two officers, not in uniform, were present in the same room as Reavley. He was read his *Miranda* rights approximately one hour into the interview after Reavley stated that he saw a psychiatrist soon after the murders and asked the doctor if he (Reavley) could have possibly committed the murders. After the interview Reavley was not arrested, and he left the station. Approximately six months later, Reavley was arrested for the crimes.

¶8    Police were notified that Reavley consulted counsel after he left the station. The following evening, September 5, 2001, Klesh met with Reavley at a local hotel. Unbeknownst to Reavley, she had agreed to assist the police in their investigation by wearing a wire to record her conversation with Reavley. Klesh made false statements to Reavley during their conversation. Although Reavley used much of this conversation to try to convince Klesh he was innocent, he made several statements which could be viewed as incriminating. Additionally, during this conversation, Reavley freely told Klesh about his conversations with his attorney.

¶9    On March 18, 2002, Reavley was charged by Information with two counts of murder in the first degree for the murders which occurred on September 4, 1964. On July 8, 2002, Reavley filed a Motion to Suppress two sets of statements. The first was the statement given

3

to law enforcement on September 4, 2001, during questioning at the police station. The second was the recorded conversation with Klesh. Reavley was not represented by counsel at the time of the first statement, but he had consulted counsel before the second statement. Law enforcement was aware of this fact before they recorded his conversation with Klesh.

¶10 After holding an evidentiary hearing, the District Court granted Reavley's motions to suppress both statements. Reavley did not testify at this hearing. The State filed this timely appeal.

Discussion

¶11 1. Whether the District Court erred in granting Reavley's motion to suppress the statement that he made to law enforcement?

¶12 We review a district court's ruling on a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether the court's interpretation and application of the law is correct. *State v. Olson*, 2002 MT 211, ¶ 7, 311 Mont. 270, ¶ 7, 55 P.3d 935, ¶ 7 (citation omitted). A finding of fact is "clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if this Court has a definite or firm conviction that the district court committed a mistake." *State v. Loh* (1996), 275 Mont. 460, 475, 914 P.2d 592, 601 (citations omitted).

¶13 The District Court granted Reavley's motion to suppress his September 4, 2001, statement to law enforcement. The District Court found that the police gave mere lip service to the *Miranda* warnings. The court noted that Reavley inquired about a need for counsel.

4

The court also found that the officers used psychological coercion by implying Reavley would receive leniency if he confessed to the crime, by making repeated religious references, by telling Reavley a hypnotist was on the way, and by lying about DNA evidence that did not exist. However, a careful review of the record does not support the District Court's findings.

¶14 Pursuant to § 46-13-301, MCA, a defendant may move to suppress as evidence any admission or confession given by him on the ground that it was involuntary. The State must then prove by a preponderance of the evidence that the admission or confession was voluntarily made. Section 46-13-301(2), MCA.

¶15 Voluntariness is a factual question which takes into account the totality of the circumstances. *Loh*, 275 Mont. at 475, 914 P.2d at 601 (citations omitted). Totality of the circumstances includes the following factors: the defendant's age and education level; the length and method of the interrogation; whether the defendant was advised of his or her *Miranda* rights; the prior experience of the defendant with the criminal justice system and police interrogation; the defendant's experience and background; and the defendant's demeanor, coherence, articulateness, and capacity to make full use of his or her faculties. *State v. Scarborough*, 2000 MT 301, ¶ 32, 302 Mont. 350, ¶ 32, 14 P.3d 1202, ¶ 32 (citing *Loh*, 275 Mont. at 475-76, 914 P.2d at 601-02). Voluntariness is supported by the presence of timely and complete *Miranda* warnings. *Scarborough*, ¶ 33.

¶16 "[A] confession or admission extracted by any sort of threat or violence, by the exertion of any improper influence, or by any direct or implied promises, however slight, has

5

the potential for being involuntary." *Scarborough*, ¶ 32 (citing *Loh*, 275 Mont. at 476, 914 P.2d at 602). We have in the past condemned police practices of lying about the existence of incriminating evidence when the evidence was inconclusive, lying about other arrestees giving confessions when they have not, and promising psychiatric treatment in exchange for a confession. *State v. Phelps* (1985), 215 Mont. 217, 224-25, 696 P.2d 447, 452. Any one of these actions may make a confession involuntary.

¶17 "The Fifth Amendment to the United States Constitution and Article II, Section 25, of the Montana Constitution provide that no person shall be compelled, in any criminal case, to be a witness against himself." *State v. Olson*, 2003 MT 61, ¶ 13, 314 Mont. 402, ¶ 13, 66 P.3d 297, ¶ 13 (hereafter "*Olson (2003)*"). In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the United States Supreme Court addressed this privilege against self-incrimination. "The *Miranda* Court held that the prosecution may not use statements that stem from a custodial interrogation of a defendant unless the defendant is warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Olson (2003)*, ¶ 13 (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706-07). This gave birth to what we commonly refer to as the *Miranda* warnings. *Olson (2003)*, ¶ 13.

¶18 The *Miranda* warnings are not required to be given by law enforcement unless a person is subject to a custodial interrogation. *State v. Dawson*, 1999 MT 171, ¶ 30, 295 Mont. 212, ¶ 30, 983 P.2d 916, ¶ 30 (citing *United States v. Ritchie* (10th Cir. 1994), 35 F.3d 1477, 1485). A custodial interrogation is "questioning initiated by law enforcement officers

6

after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way[,]" *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706, and occurs when "there is a significant restriction of personal liberty similar to an arrest." *Dawson*, ¶ 35. Before *Miranda* warnings are required, a suspect must be "in custody" and the questioning conducted must meet the legal definition of an "interrogation." *Dawson*, ¶ 30 (citation omitted). A person is "in custody" if "he has been deprived of his freedom of action in any significant way, or his freedom of action has been curtailed to a degree associated with a formal arrest." *Dawson*, ¶ 30 (citation and internal quotations omitted).

¶19 Whether custodial interrogation has occurred is determined on a case-by-case basis and focuses on whether a "reasonable person" would feel free to leave. *Dawson*, ¶ 33. This Court examines the following six factors to determine whether or not a custodial interrogation has occurred: "(1) place of the interrogation; (2) time of the interrogation; (3) persons present during the interrogation; (4) whether *Miranda* warnings were gratuitously given; (5) the length and mood of the interrogation; and (6) whether or not the suspect was arrested following the interrogation." *Olson (2003)*, ¶ 15 (citing *State v. Staat* (1991), 251 Mont. 1, 6, 822 P.2d 643, 646).

¶20 An interrogation is not custodial and *Miranda* is not required merely because an interrogation took place in a coercive environment (such as a station house) or because a person questioned is the focus of a police investigation. *State v. Dannels* (1987), 226 Mont. 80, 87-88, 734 P.2d 188, 193-94. In *State v. Dannels*, we determined that *Miranda* warnings were not required prior to a suspect's questioning at police headquarters because she

7

voluntarily went to the police station, she was not arrested prior to or subsequent to the questioning, she willingly answered the questions, and she left the station after the questioning was over. *Dannels*, 226 Mont. at 88, 734 P.2d at 194.

¶21 A request for counsel must be clear, unambiguous, and unequivocal. *State v. Spang*, 2002 MT 120, ¶¶ 20-22, 310 Mont. 52, ¶¶ 20-22, 48 P.3d 727, ¶¶ 20-22. "[L]ay people are not learned in constitutional principle nor legal nicety" and are not required to utter precise words in order to invoke their right to counsel. *Spang*, ¶ 23 (citation omitted). Nonetheless, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *State v. Simmons*, 2000 MT 329, ¶ 21, 303 Mont. 60, ¶ 21, 15 P.3d 408, ¶ 21.

¶22 In the instant case, there are two distinct phases of Reavley's interview with police officers on September 4, 2001. The first phase began at the start of the interview and the second began after Reavley told officers he consulted a psychiatrist soon after the murders. Keeping these two phases in mind, we examine the circumstances surrounding Reavley's interview to determine if it was a custodial interrogation. First, we consider the time of the interview/interrogation. Reavley chose the date, September 4, 2001, and the time, approximately 9:00 a.m., to meet with the officers. The date happened to be on the anniversary of the murders, but this was Reavley's choice. Although Reavley now argues that he was forced to miss work and a work-related meeting because of the police interview,

8

the police are not to blame because Reavley chose the date and the time. This factor weighs in favor of the State.

¶23 Next we examine the place of the interrogation. Reavley voluntarily met with police at the Great Falls Police Department. He drove himself to the station house, answered questions, and freely left after the questioning was over. This case is nearly identical to that in *Dannels* when we determined that *Miranda* warnings were not required. The suspect in *Dannels* also voluntarily went to the police station, was not arrested prior to or subsequent to the questioning, willingly answered the questions, and left the station after the questioning was over. *Dannels*, 226 Mont. at 88, 734 P.2d at 194. This factor weighs in favor of the State.

¶24 The third factor we consider is the persons present during the interrogation. Reavley and two police officers were present during the interview along with one laboratory technician who briefly appeared. Neither officer was in uniform. Reavley now contends that he was not permitted to leave or to contact counsel. However, Reavley never requested to leave or to contact counsel. This factor weighs in favor of the State.

¶25 Fourth we consider whether *Miranda* warnings were gratuitously given. The entire interview lasted approximately four hours and twenty minutes. *Miranda* warnings were not given to Reavley until approximately one hour into the interview. This was done after Reavley informed the officers that he saw a psychiatrist within days of the offense and asked the doctor if he (Reavley) could have committed the murders. At this time, the officers decided they needed to ask some "more difficult and tougher" questions of Reavley and

9

wanted to ensure he was aware of his rights. After being read the *Miranda* warnings, Reavley stated he was still willing to talk to the officers and he signed a waiver. He was assured by one officer that he could stop the interview at any time. Later in the interview, Reavley asked one officer if he needed an attorney. The officer responded by stating that he should not advise Reavley but that his personal opinion, far removed from the case, was that "if you're innocent, you've got nothing to worry about."

¶26 Weighing all these factors, we determine that *Miranda* rights were gratuitously given. Although they were not given at the start of the interview, they were given after the mood of the interview grew more focused because of Reavley's revelation regarding his psychiatric treatment. The officers did not mislead Reavley or pressure him into signing the waiver of his rights. This factor weighs in favor of the State.

¶27 The fifth factor we consider is the length and mood of the interrogation. The interview lasted approximately four hours and twenty minutes. Several breaks were taken. The officers offered Reavley coffee and food. Reavley never asked to leave and he was never prevented from doing so by the officers. He drove himself down to the police station. He was not handcuffed or otherwise restrained. The officers were not wearing uniforms. Reavley actually complimented the officers on being so polite to him. He was left alone in the interview room. No guard was present. He was free to leave the station at any time. He was advised he could stop the interview if he chose. Reavley did not ask to use a telephone. At the conclusion of the interview, he was allowed to go home. This factor weighs in favor of the State.

¶28 The last factor we consider is whether the suspect was arrested following the interrogation. The interview occurred on September 4, 2001. Reavley was charged by Information with the murders on March 18, 2002, approximately six months after the interview. This factor weighs in favor of the State.

¶29 Based on the foregoing factors, Reavley was not "in custody" when he was questioned by the police. Therefore, *Miranda* warnings were not required when the questioning began. Furthermore, when the initial interview took on a more focused tone, Reavley was read his *Miranda* rights which he freely waived.

¶30 The officers did not act improperly. They did not lie to Reavley about the existence of incriminating evidence or confessions. Reavley was told that the police were working on DNA evidence recovered from a glove near the scene. This was not a lie. Reavley was asked, "we're working on the DNA–what happens when that comes back?" No promise of psychiatric treatment in exchange for a confession was made. No threats or violence, subtle or overt, were used at any time during the interview.

¶31 The facts of the present case differ significantly from *State v. Grey* (1995), 274 Mont. 206, 907 P.2d 951, in which we found a suspect's confession was not voluntary. In *Grey*, the police lied about the existence of incriminating evidence, the monetary value of the stolen merchandise, and the fact the police were going to interview each store employee when they only intended to interview the defendant. Importantly, the police in *Grey* did not give the defendant adequate *Miranda* warnings. Grey did not sign a waiver of *Miranda* rights and there was no record of these rights having been read. 274 Mont. at 206, 907 P.2d at 955.

¶32 The police actions in the instant case do not parallel those in *Grey*, as Reavley claims. Reavley was properly given *Miranda* warnings. No lies were told about the existence of incriminating evidence. No promises of leniency were given in exchange for a confession. Furthermore, Reavley did not testify at the suppression hearing so it is impossible to ascertain from the record if the religious references the police made exerted any coercive pressure on him. Regardless, the police are not prohibited from talking about religious topics during an interview. Although the police did tell Reavley that a hypnotist was going to be arriving when none in fact arrived, this statement was not about the existence of incriminating evidence. Based on the totality of the circumstances, we determine that Reavley's admissions were voluntary.

¶33 In this case, Reavley voluntarily waived his *Miranda* rights by signing the waiver. At no time did he make a clear, unambiguous, and unequivocal request to consult with counsel. *Spang*, ¶¶ 20-22. In *State v. Johnson* (1986), 221 Mont. 503, 514, 719 P.2d 1248, 1255, we determined that the suspect's statement "I would like to talk to somebody" after he was read his *Miranda* rights was sufficient to invoke the right to counsel. Likewise, in *Spang* we found that the statement "Shit, I need a lawyer, man" after a suspect was advised of his rights, was also an invocation of the right to counsel. *Spang*, ¶ 25. Reavley asked the interrogating officer if the officer thought he needed an attorney. A reasonable police officer in those circumstances is not expected to understand that statement to be a request for an attorney. *Simmons*, ¶ 21.

12

¶34    Based upon the foregoing, we find that the District Court's findings of fact are clearly erroneous and the court's interpretation and application of the law were incorrect. To summarize, Reavley was not subject to a custodial interrogation so *Miranda* warnings were not required at the start of the interview. Reavley was read and freely waived the *Miranda* rights when the interview became more focused. Last, Reavley did not sufficiently invoke his right to counsel. We reverse the District Court's decision to suppress Reavley's statement to law enforcement authorities.

¶35    2.    Whether the District Court erred in granting Reavley's motion to suppress the recorded conversation between Reavley and Klesh?

¶36    We review a district court's ruling on a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether the court's interpretation and application of the law is correct. *Olson*, ¶ 7 (citation omitted). The use of informants has long been recognized as an allowable tool of police investigation. *See generally State v. Crowder* (1991), 248 Mont. 169, 810 P.2d 299; *United States v. Hayes* (9th Cir. 2000), 231 F.3d 663.

¶37    The District Court concluded, based on *Escobedo v. Illinois* (1964), 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, that the right to counsel extends to all stages preceding the trial beginning with the stage when the accused first becomes the focus of the police investigation. Based on this, the court determined that Reavley's right to counsel was violated when the police used Klesh to obtain incriminating statements without his attorney present. The District Court also concluded that the "almost sacrosanct" nature of the attorney-client

13

relationship was violated because Klesh, as a law enforcement agent, allegedly probed into the conversations Reavley had with his counsel.

¶38 Reavley advances multiple theories to support suppression of his statement to Klesh. These are violations of the right to counsel, right against self-incrimination, right to be free from unreasonable searches and seizures, right to due process, right to privacy, and right to attorney-client privilege. With exception of violation of attorney-client privilege and right to counsel, Reavley provides no legal authority supporting any of these theories, as required by Rule 23, M.R.App.P. Accordingly, we will address only those two issues.

¶39 "The Sixth Amendment right to counsel does not attach until after the initiation of formal charges." *Hayes*, 231 F.3d at 667; *Moran v. Burbine* (1986), 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410, 427; *Kirby v. Illinois* (1972), 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411, 417; *United States v. Gouveia* (1984), 467 U.S. 180, 185, 104 S.Ct. 2292, 2296, 81 L.Ed.2d 146, 152. There must be both a "criminal prosecution" and an "accused" in order for the Sixth Amendment right to attach. *Hayes*, 231 F.3d at 669. Adversarial judicial proceedings must be formally initiated. *Hayes*, 231 F.3d at 672 (citations omitted). Being the target of an investigation is not the equivalent to being formally charged with an offense and is insufficient to trigger the right to counsel. *Hayes*, 231 F.3d at 674 (citations omitted). The existence of an attorney-client relationship itself is insufficient to trigger the Sixth Amendment protections. *Hayes*, 231 F.3d at 671 (citation omitted). In cases where no formal charges are pending against a defendant at the time of

14

a surreptitious taping, the defendant's Sixth Amendment rights are not violated.  *Hayes*, 231 F.3d at 667.

¶40     Right to counsel originally attached to a person when "the investigatory process shifts from the investigation stage to the accusatory stage . . . ."  *State v. Bryan* (Tenn. Crim. App. 1998), 990 S.W.2d 231, 239.  However, "[t]hat rule has since been *completely abolished*. See, e.g., *Stansbury v. California*, 511 U.S. 318, 128 L. Ed. 2d 293, 114 S. Ct. 1526 (1994) . . . ."  *Tennessee*, 990 S.W.2d at 239 (emphasis added).  Montana law has not always been consistent regarding when the right to counsel attaches.  However, the standard in Montana is now clear and consistent with federal law as enunciated in *Hayes*.

¶41     The rule that the right to counsel attached when a police investigation "is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect" began with *Escobedo*.  378 U.S. at 490-91, 84 S.Ct. at 1765, 12 L.Ed.2d at 986.  Two lines of Montana authority developed establishing different stages as triggering the right to counsel.  In 1968, we stated that the constitutional right to counsel and the constitutional right against self-incrimination attach at such time as the police investigation shifts from a general investigation of an unsolved crime to focus on a particular suspect.  *State v. Lucero* (1968), 151 Mont. 531, 537, 445 P.2d 731, 734.  This same principle was repeated approximately thirteen years later in *State v. Mercer* (1981), 191 Mont. 418, 422, 625 P.2d 44, 47, and again in *State v. Armfield* (1984), 214 Mont. 229, 233, 693 P.2d 1226, 1229. These cases are reversed to the extent that they are inconsistent with our holding in this case.

¶42 A second line of Montana cases established a rule consistent with the present federal rule articulated in *Hayes*. In the 1978 case *State v. Lara* (1978), 179 Mont. 201, 204, 587 P.2d 930, 931, we stated that the "right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against [a defendant]." (Citations omitted.)

¶43 We have repeatedly applied this rule in recent decisions. In *State v. Schoffner* (1991), 248 Mont. 260, 265, 811 P.2d 548, 552, we stated that "a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the initiation of adversary judicial criminal proceedings–whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." (Citation and internal quotations omitted.) "In addition . . . although *Miranda v. Arizona* . . . extended the right to counsel, it did so only in the limited context of custodial *interrogations* and has no applicability to identification procedures conducted before the initiation of adversarial judicial proceedings." *Schoffner*, 248 Mont. at 265, 811 P.2d at 552 (citation omitted). Importantly, we do not condone the use of police lies and deceit to gain a confession or admission from a suspect *if the person is subject to a custodial interrogation.*

¶44 The United States Supreme Court has clearly stated that "the Sixth Amendment right to counsel does not attach until after the initiation of formal charges." *Moran,* 475 U.S. at 431, 106 S.Ct. at 1146, 89 L.Ed.2d at 427. The constitutional implications of a surreptitious investigation differ based upon whether adversarial judicial proceedings have been initiated against a suspect. If proceedings have begun, "the government may not deliberately elicit

16

incriminating statements from an accused out of the presence of counsel" and any evidence so elicited will be inadmissible. *Moran*, 475 U.S. at 431, 106 S.Ct. at 1146, 89 L.Ed.2d at 427 (citation omitted). However, if proceedings have not been initiated, evidence obtained in exactly the same manner from the identical suspect would be admissible at trial. *Moran*, 475 U.S. at 431, 106 S.Ct. at 1146, 89 L.Ed.2d at 427 (citation omitted).

¶45    In this case, Reavley was not formally charged and adversarial proceedings had not begun. He was not an "accused" and there was no "criminal prosecution." Therefore, the police's use of Klesh to obtain a taped conversation with Reavley did not violate his right to counsel. Reavley was not subject to a custodial interrogation when he spoke with Klesh. Rather, he was meeting a friend of his own volition to have a private conversation. The place of the conversation was a motel room. The time of the conversation was in the afternoon/evening. The persons present during the conversation were a private citizen and long-time friend of Reavley (even if that person was assisting law enforcement authorities). The length and mood of the conversation was intimate, congenial, and friendly. No arrest occurred following the conversation; both parties went their separate ways. No *Miranda* warnings were required under these facts, even if counsel had been retained. Unlike the defendant in *Grey*, Reavley was not at the station house being questioned and deceived by police officers.

¶46    If this were a situation in which Klesh was directed to obtain information about the privileged communications Reavley and his attorney had, the conversation might warrant suppression. For example, if a prosecutor directed an informant to obtain confidential

17

attorney client communications, that could constitute a violation of Rule 4.2 of Montana Rules of Professional Conduct, the ethical rules for attorneys, and warrant suppression. However, we do not have that situation here.

¶47    The record does not reflect that law enforcement directed Klesh to deliberately seek or that she did in fact seek privileged information regarding Reavley's conversations with his attorney.    Although Klesh did reference Reavley's attorney, she did not "purposefully intrude" into the attorney-client relationship and ask questions aimed at eliciting privileged information.  Instead, her references were appropriate responses to what Reavley was openly discussing regarding his "privileged" communications.  Reavley's voluntary disclosure of these privileged communications itself, without any prompting by Klesh, is sufficient to waive his right to their privileged nature. *United States v. Rockwell Int'l* (3rd Cir. 1990), 897 F.2d 1255, 1265 (citations omitted).

¶48    Reavley cites cases which are factually distinguishable to support his violation of attorney-client privilege claim.  Reavley directs this Court's attention to *Blumenthal v. Kimber Mfg. Inc.* (Conn. Super. 2001), 795 A.2d 1288, for the proposition that the waiver of attorney-client privilege can only occur if there is knowledge and existence of the right. That case concerned an attorney who inadvertently disclosed a privileged document to opposing counsel, without his client's knowledge or consent.  Reavley refers to *Thorne v. State* (Ga. App. 2000), 542 S.E.2d 157, in which the  attorney-client privilege was violated when defense counsel made statements to an investigator implicating his client in the robbery in question and counsel also made statements at trial as to what he told the investigator about

18

his client.  Reavley also cites *Kuiper v. District Court* (1981), 193 Mont. 452, 632 P.2d 694, in which we discussed the application of attorney-client privilege and work product privilege to documents generated in the corporate world of tire manufacturing.  The work product rule is intended to protect against disclosure of materials prepared for litigation and to protect the mental impressions, conclusions, opinions, or legal theories of an attorney concerning litigation.  *Kuiper*, 193 Mont. at 463, 632 P.2d at 700.  These cases are not relevant.  No work product is concerned in this case.  This case is also distinguishable from *Thorne* because the attorney in the present case is not charged with violating the attorney-client privilege either in or out of the courtroom.

¶49    Reavley directs the Court to *Phelps* and *Grey* for the proposition that the police cannot resort to lies, deceit and trickery in order to gain a confession.  However, the present case is distinguishable from both of these cases.  *Phelps* dealt with police deception when officers deliberately lied about the existence of incriminating evidence (when none existed) during a custodial interrogation.  215 Mont. at 225, 696 P.2d at 452.  In *Grey*, the police, also *during a custodial interrogation*, did not give the defendant adequate *Miranda* warnings, lied about the existence of incriminating evidence, lied about the value of the stolen merchandise, and lied about who else was going to be interviewed.  274 Mont. at 206, 907 P.2d at 955.  In contrast, Reavley was not subject to a custodial interrogation, the officers gave the *Miranda* warnings at the appropriate time, and no police misconduct occurred.  The officers used permissible procedures in an attempt to solve two gruesome murders.  We reverse the District Court's suppression of the recorded conversation with Klesh.

¶50     We remand for proceedings consistent with this opinion.


                                                    /S/ W. WILLIAM LEAPHART


We concur:


/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM RICE