JUSTICE McKINNON
dissenting.
¶31 On September 18,2012, Detective Noah Scott (Scott) of the Great Falls Police Department received a call from his supervisor that a six-month-old baby had arrived in critical condition at Benefis Hospital Emergency. The baby, Brooklynn, was suffering from a brain bleed, a subdural hematoma, and retinal injuries. Scott, a police officer for twelve years and an Emergency Medical Technician, is employed in the Special Victims Unit and investigates crimes against children, child abuse, sexual child abuse, and some child dependency and neglect cases. When he arrived at the emergency room, Scott spoke to Nurse Practitioner Todd Koch (Koch) about Brooklynn’s condition. The scene at the hospital was hectic. People were running in and out of the room in an effort to save Brooklynn, who was lying on the emergency room table with only slight movement in her legs and unable to breath on her own. Koch told Scott that Brooklynn had a subdural hematoma and retinal hemorrhaging, and that he believed Brooklynn had been shaken. Koch advised Scott that they were going to transport Brooklynn by air ambulance to Sacred Heart Medical Center in Spokane with the hope that Brooklynn’s brain might still be viable and that perhaps she would survive.
¶32 Brooklynn’s mother, Eskew, was in the waiting room with her mother and a female friend. Scott contacted Eskew, but did not give any information about what Koch had told him. Eskew, who stated she was the only person with Brooklynn, described how Brooklynn had been in her “saucer” and started to cry. Eskew picked up Brooklynn and started “rocking her back and forth.” Scott testified that Eskew explained, without any solicitation from Scott, that “I didn’t shake her or anything.” Due to the inadequacy of Eskew’s explanation in light of the severity of Brooklynn’s injuries, Scott believed further investigation was necessary and advised Benefis medical providers that Eskew would not travel to Spokane in the transport. Indeed, the fate of Brooklynn’s life lay in the hands of the medical providers, with an adequate explanation as to the mechanisms of Brooklynn’s injuries being the greatest assistance Eskew could provide. Since Eskew was adamant that she was the only person with Brooklyn, and her explanation of Brooklynn’s injuries was clearly inadequate, Scott *334 believed further discussion with Eskew was necessary, not only for the purpose of a potential criminal investigation, but also to assist medical providers in their treatment of Brooklynn’s injuries.
¶33 Consequently, the information law enforcement had when they interviewed Eskew was that a six-month-old child’s life lay in balance, with possibly fatal injuries. The mechanism for the injuries was unknown to medical providers, as a six-month-old is unable to speak for herself. Medical providers suspected the mechanism of Brooklynn’s injuries was shaking. Eskew was the only person with Brooklynn at the time her injuries were inflicted. Eskew provided an inadequate explanation of the mechanism of injury, in light of the severity of Brooklynn’s injuries. Finally, Eskew had announced on her own, without knowing that Brooklynn was suspected of having been shaken, that she had not shaken Brooklynn.
¶34 Following the interview, Scott learned that Brooklynn’s injuries were going to be fatal. Scott and Detective Slaughter (Slaughter) hurriedly prepared to travel to Spokane to further investigate, observe, and document Brooklynn’s injuries. Once in Spokane, they observed the progression of Brooklynn injuries. There was more bruising that developed on top of Brooklynn’s head, in addition to other changes in her actual appearance as the injuries progressed. Eventually, the medical providers at Sacred Heart concluded Brooklynn had suffered a fracture to her skull from blunt force trauma. Significant to our characterization that detectives made numerous misrepresentations about the purpose of the interview, Dr. April Jaeger, the Pediatric Emergency Room Physician who treated Brooklynn upon arrival, testified the indications from Benefis Hospital Emergency were that Brooklynn had been shaken. Further, Dr. Jaeger explained that the more information providers have about the mechanism of the injury, the better. Dr. Jaeger testified that because a baby is unable to say how the injury occurred, medical providers rely significantly on histories obtained from people around the child. Specifically, Dr. Jaeger testified that:
having additional information from those around her as to how she might have injured her head helps us understand what medical problems may develop over time and what additional diagnostic studies might be helpful to order, to determine whether or not she has additional injuries that we typically see with that specific type of mechanism.
Importantly, Dr. Jaeger testified that it was very common to have trauma from both shaking and blunt force.
¶35 Scott confirmed that one of his tasks when investigating a critical *335 injury to a child is to stay in constant communication with medical personnel who are providing the child treatment. Indeed, Scott explained that “part of my plan was to let them know the mechanism of injury; when the injury occurred and what led up to the injury, what happened after the injury.” Scott testified that when he was telling Eskew it was necessary to be honest about what happened, he was “not lying to her,” because it was part of the overall investigation to provide information to medical providers to assist with Brooklynn’s treatment.
¶36 At the beginning of the interview, Scott advised Eskew of her Miranda rights. He handed Eskew the form with the rights and advised her to read it over before signing. She took time to review it, and then signed the form indicating she had read her rights. At the risk of being redundant, a Miranda advisement informs a person that anything they might say could be used as incriminating evidence against them in a court of law; that they have the right to court-appointed counsel to assist in their defense and with their decision of whether to speak with law enforcement; and that they have the right to remain silent and to refuse to answer any questions propounded by law enforcement. Thus, following a Miranda advisement, it is illogical to suggest that the person so advised, in the absence of evidence to the contrary, does not know that the purpose of the interview is to gather evidence which potentially could be used against them in a possible criminal investigation or prosecution. Indeed, this Court has not suggested that there was any inadequacy in the Miranda warnings. Neither has the Court suggested that law enforcement indicated Eskew would not face criminal liability, that the information would not be used against her, or that law enforcement in any way made a representation which would contradict the clear warnings provided by an adequate Miranda advisement. That law enforcement also wanted to learn the mechanism of Brooklynn’s injury and represented this as their purpose does not make the representation a misstatement, lie, or untruth—particularly given the responsibility of law enforcement for obtaining a history when a nonverbal infant has been critically injured.
¶37 The District Court appreciated that the medical evidence established the mechanism of Brooklynn’s death was a blunt force impact to the front of the skull and that the skull fracture could not have been caused by shaking alone. However, medical experts could not rule out the possibility that Brooklynn had also been shaken. The District Court explained, “this isn’t about the actual accuracy of her confession; it’s about whether it was voluntary, knowing and intelligent.” Further, the District Court appreciated the fact that law enforcement did not believe they were getting a truthful statement and *336 persisted in representing they needed accurate information for treatment of Brooklynn’s injuries, concluding that such representations did not render Eskew’s statements involuntary. The District Court held:
Well, they said that up-front and I—when I read the transcript, I was initially really concerned about that, frankly. But as I got down through the course of the thing, that kind of fell away. And what it came down to, it seemed to me, at the end of the day was, is that just were—they were persistent, doggedly persistent, in saying, we basically—we don’t believe you, you’re lying. The facts that we know don’t support that. ... They didn’t misrepresent the medical evidence as we know it or as it existed at the time. And I don’t think that the constitutional law in this State or this country has advanced so far that police can’t say we don’t believe you; we think you’re lying.
¶38 We review a district court’s findings of fact on a motion to suppress an admission or a confession to determine whether the findings are clearly erroneous. Old-Horn, ¶ 13. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if this Court has a definite or firm conviction that the district court committed a mistake. State v. Loh, 275 Mont. 460, 475, 914 P.2d 592, 601 (1995). Significantly, a motion to suppress based upon the voluntariness of a confession or admission is “largely a factual determination that is within the discretion of the district court.” Grey, 274 Mont. at 209, 907 P.2d at 953 (citing State v. Lenon, 174 Mont. 264, 271, 570 P.2d 901, 906 (1977) (emphasis added)); see also Old-Horn, ¶ 14 (“The question of whether a defendant has given a confession voluntarily is a factual determination within the province of the district court.”); State v. Hayworth, 1998 MT 158, ¶ 20, 289 Mont. 433, 964 P.2d 1.
¶39 In my opinion, the Court conveniently omits from its standard of review that portion which recognizes the matter is “largely a factual determination that is within the discretion of the district court.” Grey, 274 Mont. at 209, 907 P.2d at 953; Old-Horn, ¶ 14. In doing so, the Court ultimately substitutes its evaluation of the evidence for that of the trial court. A trial court is in the best position to observe the demeanor of the witnesses and assess their credibility. A trial court’s factual findings may not be reversed unless clearly erroneous and not supported by substantial evidence. As I find the court’s factual findings to be supported by substantial evidence and, further, that the court correctly applied the law by considering the totality of circumstances, *337 I would not substitute my evaluation of the evidence simply because I would have concluded differently had I been sitting as a trial judge.
¶40 In evaluating the voluntariness of a confession, the court was required to make particular findings of facts based on the law. In determining the voluntariness of a defendant’s confession, the United States Supreme Court has directed that the assessment consider the “totality of all the surrounding circumstances,” including the interrogation techniques used by the police; the defendant’s age and level of education; the defendant’s prior experience with the criminal justice system; the defendant’s demeanor, coherence, articulation, and capacity to make use of his or her faculties; and whether the defendant was advised of his or her Miranda rights. Schneckloth v. Bustamonte, 412 U.S. 218, 225-26, 93 S. Ct. 2041, 2046 (1973); Old-Horn, ¶ 17. This Court has explained the factors relevant to the inquiry include:
[T]he defendant’s age, maturity, education, physical condition, and mental health; the defendant’s demeanor, coherence, articulateness, and capacity to make full use of his or her faculties; the defendant’s background and experience, including any prior experience with the criminal justice system and police interrogation; the length, mood, location, and continuity of the questioning; the use of threats, violence, or physical punishment (such as deprivation of food or sleep); the exertion of improper influence, psychological coercion, deception, or implied or express promises; and whether the police advised the defendant of his or her rights to remain silent and to have counsel present during custodial interrogation.
Morissey, ¶ 47. Voluntariness is supported by the presence of timely and complete Miranda warnings. State v. Reavley, 2003 MT 298, ¶ 15, 318 Mont. 150, 79 P.3d 270. As it pertains to voluntariness of confessions, the burden lies with the prosecution to prove by a preponderance of the evidence that the confession was voluntary. Section 46-13-301, MCA. Thus, the District Court was required to make factual findings under the totality of circumstances by considering the particular aforementioned factors to determine whether the State established by a preponderance of the evidence that Eskew’s admissions were voluntary.
¶41 And the District Court did. The District Court, which was familiar with the nature of the entire proceeding, heard testimony from witnesses, reviewed the videotape interview, and issued comprehensive and detailed findings of facts and conclusions of law. The District Court found the Miranda warnings were adequate and complete. It found that although Eskew sobbed throughout the first half of the interview, *338 she progressively became more composed. Indeed, she was “quite composed, articulate and affirmatively explanatory when answering” as the interview progressed, and the District Court noted that “when answering, for the most part, she was not sobbing or crying [.] ” The District Court’s findings were supported by the fact that during the entire time of the interview, Eskew did not once ask about the welfare of her child and although she appeared to be sobbing, Scott testified she was not tearful. The District Court observed that while Eskew became more composed as the interview progressed, the detectives, conversely, became more frustrated, confrontational “and emphatic in challenging her veracity and in challenging the consistency of her statements during the course of the interview.” The District Court specifically found that both detectives “at all times, remained civil, respectful and generally polite in their confrontation and interrogation regarding this very serious matter to all parties involved.” Observing that the detectives were not physically threatening in any manner and did not conduct or impose themselves in a physical or menacing manner, the District Court nonetheless found that there were times when the detectives raised their voices, but never yelled. The District Court placed this in context, however, finding this was only noteworthy because of their general soft-spoken approach otherwise used throughout the interview. The District Court determined that the detectives used a mixture of leading questions and open-ended questions and “employed a personal variation of... the Reid Technique” that, with the exception of the representation that the focus of the interview was to facilitate medical care for the child, was not “unduly or unfairly coercive, deceptive or manipulative under the totality of circumstances.”
¶42 The District Court observed that at the time of the interview Eskew was twenty-one years old; the mother of a six-month-old child; single and living in the home of her parents with the child. Further, the court observed that by “all credible indications in this case, [Eskew appeared] to be a highly intelligent and articulate young woman, of average or above-average maturity for a 21-year-old in her circumstance.” The District Court noted that she was employed at JCPenney, was a high school graduate, and had obtained a two year Associate of Arts Degree with a major in Education from the Montana State University, College of Technology. The District Court observed that Eskew had no prior history or reports of mental health problems and that the interview was neither “physically or psychologically overwhelming.” The District Court stated:
*339 [DJespite the inherently traumatic nature of her situation and circumstance, whether she be guilty or be innocent, Ms. Eskew manifestly appeared to be fully cognizant of her situation, circumstance, and most importantly, the substance of the interview questions being posed to her. There was no indication, whatsoever, that she wasn’t tracking, that she was being overwhelmed or that she was being coerced or manipulated, in any regard.
The District Court concluded by explaining
At [the] end of the day, the detailed incriminating statements and demonstrations made by Ms. Eskew came from her. She did not simply acquiesce with a yes or a nod to detailed police suggestions about what happened, [but] articulated the specifically incriminating details and made the specifically incriminating demonstration to police.
¶43 Importantly, the District Court addressed the issue surrounding the detectives’ alleged misrepresentation that their only purpose in interviewing Eskew was to obtain medical information for the care of her child. As the District Court observed, even if the purpose of the interview was to facilitate a criminal investigation, this did not make the interview coercive, deceptive, or otherwise manipulative. At the time of the interview, detectives believed Brooklynn had suffered shaking injuries and only later learned that the child’s trauma was related to blunt force. The District Court found that they did not “trick or manipulate or deceive Ms. Eskew to make the incriminating statements and demonstrations that she ultimately made.” The District Court specifically found that the incriminating statements were the result of Eskew being challenged “about her veracity and the consistency of her accounts during the interview, in relation to the apparent or preliminary nature of the child’s injuries as then known to the police ...,” and not as a result of any misrepresentation.
¶44 It bears mentioning that the suspicions of Scott and Slaughter that Eskew was not being truthful during the interview ultimately proved to be well-founded. Shortly after their interview, detectives learned that Eskew had lied about being alone with Brooklynn at the time of the incident. Rather, Eskew’s boyfriend, Greg Robey, was at Eskew’s home with Eskew and Brooklynn and ran when he heard the ambulance sirens. Law enforcement also learned that Eskew had lied to them at the hospital when she said a male who had approached her was her brother when, in fact, it was Robey. Further, law enforcement subsequently learned that Robey and Eskew had sexual intercourse on the day of the incident, and provided different accounts of the *340 encounter. Eskew subsequently gave birth to Robey’s twins and claimed that he had raped her on September 18, 2012. Conversely, Robey testified that he did not want to have sex, but that Eskew did. In light of these subsequent discoveries by law enforcement, it is clear Scott and Slaughter were justified in their suspicions regarding Eskew’s veracity and their challenges to the truthfulness of her statements were entirely reasonable and well-founded. As the District Court observed, there is nothing that prevents the police from saying “we don’t believe you.”
¶45 The Court is incorrect in its assessment of the District Court’s findings of fact. The Court asserts multiple “misrepresentations” were made by police which the District Court, in fact, found were true. This is particularly the case when the Court states the District Court found the detectives “purposely lied” in order to manipulate and misrepresent the situation to Eskew. The District Court found that if there was any misrepresentation by detectives it concerned the detectives’ representation that their only purpose was to obtain information for medical care, rather than to facilitate a criminal investigation. The representation, however, was singular in its content, although perhaps made on several occasions. Nonetheless, it is clear the District Court and the parties understood the detectives believed the child suffered from shaking injuries at the time of the interview. It is also equally clear that one of the purposes of the interview was to obtain a history of the mechanism of injury to a nonverbal infant from the only person who could speak for the child—the child’s mother, Eskew. The Court fails to grasp the significance of this difference, which the District Court was able to understand and thereby place the representation within context of the overall interview. This is a poignant example of why the standard of review is so significant. The Court finds no error in the District Court’s factual findings and, indeed, accepts them in total, but nonetheless substitutes its evaluation of the evidence for that of the District Court.
¶46 A confession that is extracted by a threat of violence, the exertion of any improper influence, or direct or implied promises has the potential to be involuntary. Reavley, ¶ 16. There were no threats of violence or direct or implied promises. Assuming for the sake of argument a misrepresentation as to the purpose of the interview was made, such does not establish an improper influence when Miranda warnings are adequate, understood, and acknowledged. This is particularly so when nothing with respect to the misrepresentation undermines or contradicts the Miranda warnings and when law enforcement are required to assist in obtaining medical information for *341 health care providers. Here, the victim was a non-verbal infant whose mother indicated no one else but herself was with the infant at the time of the incident. The child’s life lay in balance as medical providers attempted to assess the mechanism of her injuries and to provide appropriate medical treatment to save Brooklynn’s life. Although the purpose of the interview may have been, in part, to conduct a criminal investigation, Miranda warnings covered this purpose and nothing in the record establishes any representation contradicted these warnings. That there may have also been a purpose of law enforcement to save Brooklynn’s life by learning the mechanism of the injury does not render Eskew’s confession involuntary. While we cannot change the tragic circumstances of this case, we can appreciate and recognize the legitimate purpose of law enforcement conducting an interview to gain a history and learn the mechanism of injury in order to facilitate Brooklynn’s treatment.
¶47 In my opinion, given that the voluntariness of a confession is ultimately a factual determination to be made by the District Court, we have distorted the standard of review in order to substitute our evaluation of the evidence for that of the trial court. In doing so, I am sure we fail to appreciate many of the nuances, circumstances, and subtleties that the trial judge observed first-hand by presiding over these proceedings. If we correctly applied the standard of review, we would find that the District Court’s findings were supported by substantial evidence, the District Court clearly did not misapprehend the effect of the evidence, and there was no mistake in determining that Eskew’s admissions were voluntary based upon a preponderance of the evidence. The District Court only had to find that a preponderance of the evidence supported voluntariness. It was for the jury, and not this Court, to decide the ultimate question of voluntariness and the weight to be attributed to Eskew’s statements.
¶48 Accordingly, I would find that the confession was voluntary and reach the more difficult issue of whether the District Court abused its discretion in excluding expert testimony on false confessions. To the extent we hold otherwise, I dissent.
JUDGE ULBRICHT, District Court Judge sitting for JUSTICE COTTER, joins in the Dissenting Opinion of JUSTICE MCKINNON.