FILED

06/23/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0515

DA 15-0515

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 154

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

CHAD LARSEN MAILE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 15-226
Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Chief Appellate Defender, Moses Okeyo, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Jonathan M. Krauss,
Assistant Attorney General, Helena, Montana

            Scott D. Twito, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs:  April 26, 2017

Decided:   June 23, 2017

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1     Chad Larsen Maile (Maile) appeals from the June 8, 2015 order of the Thirteenth Judicial District Court, Yellowstone County, denying his motion to reverse and remand the Justice Court's denial of his motion to suppress evidence obtained during the interrogation of him by Montana Fish, Wildlife, and Park (FWP) game wardens at a game check station.  We affirm.

¶2     We address the following issues on appeal:

*1. Did the District Court err in affirming the Justice Court's determination that Maile was not subject to custodial interrogation at the FWP game check station and thus was not entitled to* Miranda *warnings prior to questioning by the game wardens?*

*2. Did the District Court err in affirming the Justice Court's determination that the admissions Maile made were voluntary?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     On November 17, 2013, Maile and Paul Olson (Olson) stopped at a FWP game check station just outside of Columbus, Montana, with a mule deer harvested by Maile in the bed of the pickup truck.  FWP game wardens inspected the deer at the check station and contacted Maile after observing that the license attached to the deer had been issued to a female hunter.  The wardens asked Maile about the deer and he began to answer questions and converse with the wardens.  He eventually made numerous admissions over the course of the questioning.  The investigation was recorded by the Outdoor Channel "Wardens" reality television show, which was on scene and filming the questioning of Olson and Maile.

2

¶4 During the course of the wardens' investigation, Maile admitted that he shot the mule deer and placed his daughter's tag on the animal. He also told the wardens that he had illegally shot two additional deer using his fiancé's tags in Yellowstone County, Montana. He informed the wardens that one deer was currently being processed at a commercial butcher in Billings, Montana. The wardens subsequently went to Maile's home and he consented to a search of his freezer. The wardens located and confiscated the deer meat that they determined had been illegally harvested.

¶5 Maile was subsequently charged with License, Permit or Tag Offense in violation of § 87-6-304(5), MCA; Unlawful Possession, Transfer, or Transport of Game Animal in violation of § 87-6-202(1), MCA; and Hunting or Killing a Game Animal Over the Legal Limit in violation of § 87-6-413(1), MCA. Maile moved to suppress evidence gathered at the FWP check station, arguing that the incriminating statements Maile made were fruits of an illegal interrogation. On July 16, 2014, the Justice Court conducted a suppression hearing and, on July 25, 2014, the court denied Maile's motion, concluding that Maile was not subject to custodial interrogation at the check station and thus was not required to receive *Miranda* warnings.[1] On August 15, 2014, the Justice Court held a non-jury trial and, on August 28, 2014, the court found Maile guilty on all three counts of the indictment.

¶6 Maile appealed to the Thirteenth Judicial District Court, contending that he was subjected to a custodial interrogation without first being given *Miranda* warnings, and that the admissions he made were not given voluntarily and thus should be suppressed.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

3

The District Court affirmed the Justice Court on the same grounds given by the lower court. Maile filed a timely appeal with this Court. Additional facts will be provided as necessary to address the issues raised.

**STANDARD OF REVIEW**

¶7 Upon Maile's appeal from the Justice Court, the District Court functioned effectively as an intermediate appellate court. *See* §§ 3-5-303, 3-10-115, MCA. We review cases that originate in justice courts of record and are appealed to a district court as if the appeal originally had been filed in this Court. Accordingly, we undertake an independent examination of the record apart from the district court's decision. *State v. Kebble*, 2015 MT 195, ¶ 14, 380 Mont. 69, 353 P.3d 1175; *State v. Lamarr*, 2014 MT 222, ¶ 9, 376 Mont. 232, 332 P.3d 258.

¶8 The Montana Supreme Court reviews a trial court's determination that a defendant was not entitled to *Miranda* warnings for correctness. *State v. Elison*, 2000 MT 288, ¶¶ 12, 34, 302 Mont. 228, 14 P.3d 456. We review a trial court's findings of fact on a motion to suppress an admission or a confession to determine whether the findings are clearly erroneous. *State v. Loh*, 275 Mont. 460, 475, 914 P.2d 592, 601 (1996). A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if this Court has a definite or firm conviction that the trial court committed a mistake. *Loh*, 275 Mont. at 475, 914 P.2d at 601. Substantial evidence requires more than a mere scintilla of evidence, but may be less than a preponderance of the evidence. *State v. Scarborough*, 2000 MT 301, ¶ 30, 302 Mont. 350, 14 P.3d 1202. The voluntariness of a confession or admission is a factual

4

question which must take into account the totality of the circumstances. *Loh*, 275 Mont. at 475, 914 P.2d at 601.

## DISCUSSION

¶9 *1. Did the District Court err in affirming the Justice Court's determination that Maile was not subject to custodial interrogation at the FWP game check station and thus was not entitled to* Miranda *warnings prior to questioning by the game wardens?*

¶10 Maile argues that the FWP wardens violated his right against self-incrimination guaranteed by the Montana and United States Constitutions when they interrogated him without first issuing him *Miranda* warnings. The Justice Court concluded that no constitutional violation occurred because Maile was not in custody for purposes of *Miranda*.

¶11 The Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution provide that no person shall be compelled, in any criminal case, to be a witness against himself. The United States Supreme Court addressed this privilege against self-incrimination in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), holding that "the prosecution may not use statements that stem from a custodial interrogation of a defendant unless the defendant is warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *State v. Olson*, 2003 MT 61, ¶ 13, 314 Mont. 402, 66 P.3d 297 (citing *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612). Thus, an individual must be apprised of his *Miranda* rights when the individual is "taken into custody or otherwise deprived of his freedom of action in any significant

5

way" and is subjected to questioning. *Olson*, ¶ 18 (quoting *State v. Belgarde*, 1998 MT 152, ¶ 26, 289 Mont. 287, 962 P.2d 571). "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608, 124 S. Ct. 2601, 2608 (2004).

¶12 Whether a "custodial interrogation" has occurred which requires law enforcement officers to issue *Miranda* warnings before questioning can begin involves a two-step inquiry: "(1) whether the individual was 'in custody' and (2) whether the individual was subjected to an 'interrogation.'" *State v. Munson*, 2007 MT 222, ¶ 21, 339 Mont. 68, 169 P.3d 364. The State does not dispute that Maile was subject to an "interrogation" in this case. Thus, we need only determine whether Maile was "in custody" at the check station at the time of the interrogation. In this regard, the United States Supreme Court has articulated "'[t]wo discrete inquiries' that are essential to the 'in custody' determination":

> first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: [was] there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Munson*, ¶ 22 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995)). This Court has explained the variety of circumstances pertinent to the first inquiry, including:

6

the language used by the officers; the location or physical surroundings where the questioning occurs; whether the individual consented to speak with the officers; the degree of pressure applied to detain the individual; whether the individual was moved to another area; whether the officers informed the individual that he or she was not under arrest and was free to leave or could ask the officers to leave; whether there was a threatening presence of several officers; whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical force; the duration of the detention; and the extent to which the individual was confronted with evidence of guilt.

*Munson*, ¶ 23. The foregoing circumstances are not dispositive and "must be considered together in determining whether 'a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" *Munson*, ¶ 24 (quoting *Thompson*, 516 U.S. at 112, 116 S. Ct. at 465). Additionally, "we note that while consideration of these factors might be useful, the ultimate inquiry is not whether a reasonable person would feel free to leave, but rather whether there was a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Elison*, ¶ 28 (quoting *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1529 (1994)).

¶13 In *State v. Dawson*, 1999 MT 171, 295 Mont. 212, 983 P.2d 916, we held that *Miranda* warnings were not required where a defendant was questioned in his hotel room because although the "mood in the room was tense because of the officer's suspicions," the questioning only took a few minutes, there were other people in the room during the questioning and a brief protective frisk, and he was not placed under arrest or in handcuffs. *Dawson*, ¶¶ 34, 36. We explained that when an investigative stop is routine and the detention is brief, it does not fall within the ambit of a custodial interrogation requiring *Miranda* warnings:

7

> This Court has previously held that law enforcement officers need not administer *Miranda* warnings to suspects during brief investigative encounters even if those encounters are somewhat coercive. Moreover, we have stated that an interrogation is not custodial unless there is a significant restriction of personal liberty similar to an arrest . . . and even temporary confinement as a safety precaution does not render the detention "custodial" for Miranda purposes . . . .

*Dawson*, ¶¶ 34-35 (citations omitted).

¶14 Likewise, in *State v. Elison*, 2000 MT 288, 302 Mont. 228, 14 P.3d 456, we found no custodial interrogation where a police officer: 1) stopped a vehicle upon hearing a report that the defendant had been observed smoking a marijuana pipe; 2) asked the defendant a moderate number of questions in a public setting and in the presence of another officer to determine the defendant's identity and to obtain information confirming or dispelling the officer's suspicion that he had been smoking marijuana; 3) requested that the defendant exit his vehicle and frisked him; and 4) informed the defendant that he was not free to leave during the questioning. In doing so, we explained, and reiterated our approval of, the United States Supreme Court's holding in *Berkemer v. McCarty*, 468 U.S. 420, 104 S. Ct. 3138 (1984):

> In *Berkemer*, the Supreme Court considered whether roadside questioning of a motorist detained pursuant to a traffic stop should be considered custodial interrogation for purposes of *Miranda*. The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and passengers, if any, of the detained vehicle." The Court also noted that under the law of most States it is a crime to leave a traffic stop without permission and "few motorists would feel free to . . . leave the scene of a traffic stop without being told they might do so." However, these factual observations did not end the Court's inquiry into whether the defendant was subjected to custodial interrogation. Instead, the Court focused on whether the defendant had demonstrated that the officer's conduct before eliciting the incriminating statement was "comparable to those [restraints] associated with formal arrest." In this regard, the

8

> Supreme Court observed that "the usual traffic stop is more analogous to a so-called 'Terry stop,' . . . than to a formal arrest." The Court decided that statements made by a defendant in response to an officer's roadside questioning did not require warnings of constitutional rights because of the brevity of questioning and its public setting, even though few motorists would feel free to leave. We have repeatedly cited *Berkemer* with approval.

*Elison*, ¶ 29 (quoting *Berkemer*, 468 U.S. at 436-39, 441, 104 S. Ct. at 3148-51) (citing

*Billings v. Skurdal*, 224 Mont. 84, 89, 730 P.2d 371, 374 (1986)).

¶15 Applying these principles to the facts of this case, we now consider whether Maile was "in custody" when the game wardens interrogated him at the game check station. We first note that a FWP check station, where hunters are required to "stop and report," is closely akin to a traffic stop which is, in turn, "more analogous to a so-called *Terry* stop, than to a formal arrest." *Berkemer*, 468 U.S. at 439, 104 S. Ct. at 3150 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)). Like the roadside questioning of a motorist detained pursuant to a traffic stop, the roadside questioning of a hunter at a game check station detains a vehicle and curtails a driver and passenger's freedom of action because it is unlikely that a hunter would feel free to leave a game check station without the permission of a game warden. However, as explained in *Berkemer*, this does not end the inquiry as to whether a custodial interrogation has occurred; rather, we must determine whether the wardens' conduct before eliciting the incriminating statement is comparable to the restraints of a formal arrest. In this vein, we have held that "[r]outine, public, and temporary investigatory stops, to confirm or dispel suspicions, are not generally custodial interrogations." *State v. Peters*, 2011 MT 274, ¶ 61, 362 Mont. 389, 264 P.3d 1124.

9

¶16 To be clear, we are not disturbing our prior holding in *State v. Boyer*, 2002 MT 33, 308 Mont. 276, 42 P.3d 771, that the governmental interest in the enforcement of Montana's wildlife laws and our constitutional right to a clean and healthful environment is sufficiently substantial to justify the minimal intrusion upon the rights of those stopped for brief questioning and a visual inspection of their vehicle and harvest therein. Indeed, *Boyer* is inapplicable to the case at bar. The *Berkemer* decision did not reconsider whether a Fourth Amendment seizure, requiring a particularized suspicion justification, occurred in that case. Instead, *Berkemer*, as explained in *Elison*, simply invoked the circumstances surrounding a *Terry* stop for analogical purposes in the Fifth Amendment context. As such, in this case, and contrary to the assertion in the Special Concurrence, we are not blending "Fourth Amendment jurisprudence and Fifth Amendment jurisprudence." Rather, we are considering whether the brief, public "stop and report" in this case, which is akin to a brief, public *Terry* stop that the Supreme Court considered in *Berkemer*, is nevertheless custodial because the other circumstances surrounding the interrogation rose to the level of a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

¶17 Here, the game wardens did not place Maile under arrest or in handcuffs. Accordingly, no formal arrest occurred prior to questioning. We also conclude that the circumstances surrounding the wardens' questioning cannot be fairly characterized as the functional equivalent of a formal arrest when viewed from the perspective of a reasonable person in Maile's situation. While the game wardens did ask Maile to step away from Olson's truck for questioning, they did not conduct a pat down frisk of Maile, nor did

they require Maile to remove the knife or firearm on his person, even when Maile volunteered to do so. Also, as in *Elison*, the questioning of Maile occurred in a public setting, at a highway rest stop, where hunters, motorists, and a camera crew were present to witness the interaction. The questioning also occurred in the presence of, at most, two other wardens at any one time in order to determine his identity and to obtain information confirming or dispelling the wardens' suspicion that he had illegally harvested the deer in the back of Olson's pickup and, as the investigation developed, the deer killed in Yellowstone County. Finally, during the investigation, Maile was left standing alone while the wardens conversed, followed leads, and wrote up citations. *Compare Olson*, ¶ 16 (concluding that a custodial interrogation occurred where "there [were] officers everywhere," and the defendant was not "ever standing alone.").

¶18 Maile's detention also occurred at a routine "stop and report" game check station, which is authorized by §§ 87-1-207 and 87-6-218, MCA, and requires all hunters traveling in the direction of a station to stop to allow FWP officers to inspect the licenses and game possessed by hunters. Like the detention of a motorist pursuant to a traffic stop, the detention of a hunter at a game check station is "presumptively temporary and brief." *See Berkemer*, 468 U.S. at 437, 104 S. Ct. at 3149. As long as hunters produce a valid license and can otherwise prove that they harvested their game legally, such roadside detentions are short in duration. A hunter's expectation upon pulling into a game check station is that he will be required to spend some time answering questions and waiting while the warden checks his license and other documents proving that a legal harvest has occurred. He may also expect to be given a citation if he has not comported

11

with the law, but, in the end, will most likely be allowed to continue on his way. *See Berkemer*, 468 U.S. at 437, 104 S. Ct. at 3149. At no point during Maile's detention was he informed that his detention would exceed that of a routine "stop and report" game inspection and, indeed, Maile was eventually allowed to go on his way after being issued a citation.

¶19 Finally, while we concede that the length of the warden's investigation and amount of questions the wardens posed to Maile exceeds that of a normal roadside investigatory stop, we cannot say that Maile's detention ripened into a custodial interrogation because the record demonstrates that the wardens kept the scope of inquiry reasonably related to the purpose for which the investigation was initiated. *See State v. Larson*, 2010 MT 236, ¶ 31, 358 Mont. 156, 243 P.3d 1130. Indeed, it was Maile's attempts to obfuscate and delay the investigation as well as his failure to answer the wardens' questions directly and truthfully that continued to confirm the wardens' suspicions and thus extend the length of the investigation. Furthermore, as shown in the "Wardens" video, Maile himself extended his roadside detention by continuing to volunteer additional information and, towards the end of his detention, even asked permission to reinitiate conversation with one of the wardens. It is because of factual circumstances such as these that we have repeatedly and "explicitly declined to define specific time parameters for roadside investigatory stops." *Larson*, ¶ 31; *see State v. Nelson*, 2004 MT 310, ¶ 23, 323 Mont. 510, 101 P.3d 261 ("We have noted that, while law enforcement officers conducting an investigation or investigatory stop should be guided by principles of reasonableness, 'effective law enforcement requires some latitude

to be given to investigating officers to react to and follow up on their observations.'") (quoting *State v. Sharp*, 217 Mont. 40, 47, 702 P.2d 959, 963 (1985)).

¶20    We conclude that Maile's roadside detainment at the FWP game check station remained public, routine, and temporary in nature, never exceeding the scope of a wildlife crime investigation. As such, Maile was not taken into custody for purposes of *Miranda* and the statements Maile made to the game wardens were admissible against him.

¶21    *2. Did the District Court err in affirming the Justice Court's determination that the admissions Maile made were voluntary?*

¶22    Maile also argues that the confession he made to the FWP game wardens was involuntary under the totality of the circumstances of his interrogation. The Justice Court determined that Maile was not intimidated or coerced into admitting to the wardens that he illegally harvested deer in both Carbon County and Yellowstone County.

¶23    While both the Justice Court and the District Court seemed to conflate the analysis of the *Miranda* issue above with the voluntariness issue addressed here, it is important to note that these are two distinct grounds upon which Maile challenges the admissibility of his statements and it is necessary to analyze these discrete issues accordingly.[2] Unlike the *Miranda* doctrine, which is grounded in the Fifth Amendment's Self-Incrimination Clause and applied to the states via the Fourteenth Amendment's Due Process Clause, the United States Supreme Court has "based the rule against admitting coerced confessions primarily, if not exclusively, on notions of due process" under the Fifth and Fourteenth

---

[2] We previously addressed a similar case of conflation of the *Miranda* doctrine and the voluntariness doctrine in *State v. Morrisey*, 2009 MT 201, 351 Mont. 144, 214 P.3d 708.

Amendment. *Dickerson v. United States*, 530 U.S. 428, 433, 120 S. Ct. 2326, 2330 (2000); s*ee State v. Morrisey*, 2009 MT 201, ¶¶ 26-30, 351 Mont. 144, 214 P.3d 708. Thus, "where there has been no *Miranda* violation or the *Miranda* rule simply does not apply, the defendant may still challenge the admissibility of his statement on due process grounds" under the voluntariness doctrine. *Morrisey*, ¶ 30. This constitutional protection against involuntary confessions and admissions is codified in statute at § 46-13-301, MCA, and provides the procedure by which a defendant may move to suppress an involuntary confession or admission.[3]

¶24   "[T]he essential inquiry under the due process voluntariness test is whether the suspect's will was overborne by the circumstances surrounding the giving of the confession." *Morrisey*, ¶ 47 (citing *Dickerson*, 530 U.S. at 433-34, 120 S. Ct. at 2330-31). "A court must examine the totality of all the surrounding circumstances, including

---

[3] Section 46-13-301, MCA, states:

(1)   A defendant may move to suppress as evidence any confession or admission given by the defendant on the ground that it was involuntary. The motion must be in writing and state facts showing why the confession or admission was involuntary.

(2)   If the allegations of the motion state facts that, if true, show that the confession or admission was involuntary, the court shall conduct a hearing into the merits of the motion. The prosecution must prove by a preponderance of the evidence that the confession or admission was voluntary.

(3)   The issue of the admissibility of the confession or admission may not be submitted to the jury. If the confession or admission is determined to be admissible, the circumstances surrounding the making of the confession or admission may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession or admission.

(4)   If the motion is granted, the confession or admission is not admissible in evidence against the movant at the trial of the case.

14

the characteristics of the individual and the details of the interrogation, to determine whether the confession was given freely, voluntarily, and without compulsion or inducement of any sort." *Morrisey*, ¶ 47; *see Dickerson*, 530 U.S. at 434, 120 S. Ct. at 2331. The various factors relevant to this inquiry include:

> the defendant's age, maturity, education, physical condition, and mental health; the defendant's demeanor, coherence, articulateness, and capacity to make full use of his or her faculties; the defendant's background and experience, including any prior experience with the criminal justice system and police interrogation; the length, mood, location, and continuity of the questioning; the use of threats, violence, or physical punishment (such as the deprivation of food or sleep); the exertion of improper influence, psychological coercion, deception, or implied or express promises; and whether the police advised the defendant of his or her rights to remain silent and to have counsel present during custodial interrogation.

*Morrisey*, ¶ 47.

¶25 Maile contends that his statements to the wardens were not made voluntarily. He argues that *Miranda* warnings were not given to him and that the wardens would not let Maile leave until they obtained a confession. He claims that the wardens used coercive questioning for over thirty minutes and that the questioning was "aggressive, confrontational, and emphatic." Maile also argues that the wardens "threatened" to bring obstruction of justice charges against him, at which point Maile contends he was forced to acquiesce and confess to avoid charges against himself, his daughter, and his fiancé.

¶26 First, the fact that the wardens did not advise Maile of his *Miranda* rights is not relevant in this case because we have determined that Maile was not required to receive such warnings. Additionally, Maile does not argue, and there is no reason to suggest, that his age, maturity, education, physical condition, mental health, demeanor, coherence,

articulateness, capacity, background, or his general and criminal justice experience precluded him from giving a free and voluntary confession. He also does not contend, and the record does not demonstrate, that the wardens engaged in behavior relating to improper influence, psychological coercion, deception,[4] or that they made implied or express promises to him, acted violently toward him, or physically punished him in order to produce a confession. Rather, Maile argues that he felt the compulsion and inducement to confess due to the length, mood, and location of the interrogation, as well as the wardens' threat of prosecution. We are not persuaded.

¶27 With respect to the location and length of the interrogation, we conclude that, just as the circumstances surrounding Maile's detainment failed to rise to the level of a custodial interrogation under *Miranda*, many of the same circumstances surrounding the public, routine, and temporary detainment of Maile support the Justice Court's finding that his confession was voluntary. The wardens interviewed Maile in public, with other hunters, motorists, and a camera crew witnessing the interrogation. Further, they left Maile standing alone on more than one occasion and allowed him move about freely. At one point, the "Wardens" video shows that he and Olson were even listening to a game on the truck's radio when one of the wardens approached them. In short, we cannot say that the wardens in any way took advantage of the location of the questioning in an attempt to create a coercive environment.

---

[4] We recognize that, contrary to one of the warden's contentions, there are no facts in the record to suggest that Maile could have been charged with Obstructing Justice under § 45-7-303, MCA. However, given that Maile does not argue, and we find nothing in the record to suggest, that the warden deceived Maile to obtain his confession, we will not address whether the warden engaged in a deceptive interrogation practice that runs afoul of the United States Constitution.

¶28 As for the length of the interrogation, while the timing and number of questions the wardens posed to Maile weighs slightly in his favor, we have upheld confessions obtained during interrogations lasting much longer than, as Maile contends, the approximately thirty minutes of questioning Maile endured here. *See, e.g., Morrisey*, ¶ 48 (upholding a confession where the interrogation lasted "roughly three hours during the afternoon, followed closely by two or three hours in the evening"); *State v. Reavley*, 2003 MT 298, ¶ 27, 318 Mont. 150, 79 P.3d 270 (upholding a confession where the "interview lasted approximately four hours and twenty minutes"). Additionally, the record demonstrates that the wardens' line of questioning was not only direct and responsive to Maile's vague and untruthful answers, but that Maile himself willingly engaged in, and at times initiated, a running conversation with the wardens.

¶29 With respect to the mood of the interrogation, we concede that, at times, the wardens became increasingly forceful in their questioning and confrontation of Maile, particularly when they caught him being untruthful. However, the record demonstrates that, on balance, the wardens remained calm and professional even in the face of Maile's clear attempts to obfuscate and delay the investigation. Maile cites a section of the interrogation where Wardens Heaton and Burroughs confront Maile regarding his misleading statements and attempts to change the subject:

> Warden Heaton: No, what did I ask you? What did I ask you [gesturing towards Maile with four fingers]? I asked you for [Louri's] phone number or an address and you're rattlin' off a bunch of other things here. That's being uncooperative. Ok. Where is she at? What about Mary? How do I get in touch with Mary?

17

Maile:  Probably a phone, but I don't have that memorized either.  I'm just telling you the truth.

Warden Burroughs:  Listen, the bullshit is over . . . and you haven't been telling the truth [pointing at Maile].

Maile:  Yes, I have.

Warden Burroughs:  Then why did Paul tell us the truth?  You shot that deer, Louri and Mary Ann were never here today.  Now quit lyin' to me.  That's bullshit.

Maile:  Ok, whatever.  Take the deer, take my license, whatever you are doing, do it.

Warden Burroughs:  All we wanna do is find out the truth.

Maile:  Ok, do what you are doing.

Warden Burroughs:  What's the truth?

Maile:  The truth is you're going to do what you wanna do . . . you have the badge, I don't.

Warden Heaton:  I'm going to jump in here real quickly.  What we're dealing with here, like I said, we've got some issues, we've got some problems.  Ok, we need to get these straightened up, ok. . . . .  We've got wildlife violations.  It is a criminal matter, it is a problem.  It's something we can deal with ok?  It's not going to go on your record . . . the only people that are going to know about it are other game wardens in the state.  The path you're going down, that's what we call obstruction of justice.  You know what that is? That's a criminal charge.  That stays on your record.  Ok, that's something you can go to jail for. . . .

Maile:  I'm not doing anything funny . . . I'll help you, fair enough?

Warden Heaton:  No.  What we need to know is you need to tell us what happened.  No more lies. . . . .

Maile:  I am telling you I am not doing anything to obstruct you.  Ok, I am not messing with you.

Warden Heaton:  So did you shoot the deer?

18

Maile: OK. I am giving you the deer so you can do what you gotta do.

Warden Heaton: Did you shoot the deer? Yes or no.

Maile: Yes, to help my daughter.

Warden Burroughs: Was your daughter there today?

Maile: No.

Warden Heaton: That's all we needed to know.

However, despite what Maile calls an "aggressive, confrontational, and emphatic" line of questioning, Maile remained calm and conversational. He also continued to offer more information as the interrogation continued. At one point, Maile asked the wardens "what else do you need from me?" and, towards the end of the check station interrogation, asked Warden Heaton if he could speak with him further in order to "straighten things out." Considering the entirety of the interaction between the wardens and Maile, we conclude that this factor weighs in favor of the State.

¶30    Finally, we must weigh any statements interpreted as threats as part of our totality of the circumstances analysis under the voluntariness doctrine. However, we find no "threat" in this case, where the legal consequences of a suspect's conduct are pointed out and naturally flow from a truthful and honest course of conduct by the police. We do not think that Warden Heaton's statement that Maile could be subject to obstruction charges is inherently coercive; rather, we conclude that, although he miscited the applicable statute, the warden truthfully informed Maile that he could face an additional criminal charge if it was discovered that he made statements in an effort to mislead the warden or

19

hinder the investigation. Merely discussing the potential criminal consequences of such conduct fails to create an unduly coercive environment.

¶31 In sum, based on the totality of the circumstances, we hold that Maile's admissions and confession were voluntary.

## CONCLUSION

¶32 Accordingly, Maile's conviction is affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

Justice Jim Rice, concurring.

¶33 I concur with the Court's opinion. Although the Court reasons that *Boyer* is inapplicable, Opinion, ¶ 16, I believe that decision provides key support for the result here and enhances our rationale. As the Court notes, the "discrete inquiries" the United States Supreme Court has mandated be made in this case include whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Opinion, ¶ 12. The Court properly reasons that "[a] hunter's expectation upon pulling into a game check station is that he will be required to spend some time answering questions and waiting while the warden checks his license and other documents proving that a legal harvest has occurred." Opinion, ¶ 18. In *Boyer*, we

20

analyzed this same expectation at length in the context of the privilege to fish. In upholding the warden's inspection of the defendant's catch in that case, we held that our system of wildlife protection was rooted in the constitutional protections of the environment, *Boyer*, ¶¶ 22–23, and explained as follows:

> Our holding today should come as no surprise to outdoor enthusiasts. As alluded above, the Montana Fishing Regulations inform anglers of the requirement to produce their license and catch upon demand. To fish is a privilege accorded by the State, not a private right. Anglers are responsible for knowing the laws pertaining to their sport. See *State v. Huebner* (1992), 252 Mont. 184, 188, 827 P.2d 1260, 1263. In complying with the well established license requirements, anglers acknowledge the prospect of at least some governmental intrusion into their activities. In engaging in this highly regulated activity, anglers must assume the burdens of the sport as well as its benefits. . . . In this capacity, game wardens are acting not only as law enforcement officers, but as public trustees protecting and conserving Montana's wildlife and habitat for all of its citizens.

*Boyer*, ¶ 24.

¶34 Just as for the fishermen at issue in *Boyer*, there are additional burdens that hunters undertake when they choose to participate in the highly regulated sport—and privilege—of hunting, and they must expect "at least some governmental intrusion into their activities." *Boyer*, ¶ 24. I believe that this expectation, one imposed as a matter of law, makes such roadside game inspection checkpoints as the one in this case a matter of ordinary course for the hunter that weighs against the argument that such stops and inquiries constitute custodial interrogations.

¶35 I concur.

/S/ JIM RICE

Justice Laurie McKinnon, specially concurring and dissenting in part.

¶36     To begin, the Court addresses in Issue Two a matter not raised by the parties—voluntariness of Maile's confessions.  While the District Court addressed voluntariness as an issue in its order denying Maile's motion to dismiss, Maile has not raised that issue on appeal.  The sole issue Maile has presented to this Court is whether he was in custody.  As the State does not dispute that there was an interrogation, if Maile were in custody and not advised of his *Miranda* rights then his statements would have to be suppressed.  Consideration of the voluntariness of Maile's statement is premised upon the Fifth Amendment and involves a different inquiry from whether Maile was in custody.  While a custodial interrogation that occurs following a *Miranda* advisement may still implicate considerations of voluntariness; voluntariness is not relevant if there was a custodial interrogation without a *Miranda* advisement, for the simple reason that the statements are automatically suppressed.  In these proceedings, there is no dispute that a *Miranda* advisement was not given and that an interrogation occurred; consequently, Maile chose to raise on appeal only the issue of whether he was in custody.  In my opinion, the Court errs in nonetheless addressing the voluntariness of Maile's confession.

¶37     It is also my view that the Court confuses, through its blending of Fourth Amendment jurisprudence and Fifth Amendment jurisprudence, the *context* of this particular stop and the significance of context in resolving whether Maile was in custody for purposes of *Miranda*.  This was a fixed checkpoint established by FWP pursuant to § 87-1-207, MCA, which allows wardens to stop, detain, and question individuals without any individualized suspicion that the individuals were engaged in unlawful

hunting activity. It is not a *Terry* stop, requiring particularized suspicion; a voluntary stop by Maile himself; or a formal arrest, requiring probable cause. As long as the interrogation bore a reasonable relationship to the duties of the wardens, no other *justification* for the encounter was required. This does not resolve the question, however, of whether Maile was in custody for purposes of *Miranda*. As best I can ascertain, this Court has not previously considered the implications of *Miranda* within the context of a fixed checkpoint established pursuant to statute.[5]

¶38 The Supreme Court has concluded that a stop at a fixed checkpoint constitutes a seizure. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556, 96 S. Ct. 3074, 3082 (1976) ("It is agreed that checkpoint stops are 'seizures' within the meaning of the Fourth Amendment."). The Supreme Court has explained, and we have endorsed, that "a person

---

[5] Our decision in *Boyer* considered whether there was a search and seizure of fish under the Fourth Amendment and Article II, Section 10 of Montana's Constitution, not whether *Miranda* warnings applied to a person stopped at a fixed checkpoint. We held in *Boyer* that "[a]n *impermissible* . . . seizure only occurs within the meaning of Article II, Section 10 of the Montana Constitution when a reasonable expectation of privacy has been breached." *Boyer*, ¶ 18 (emphasis added). We concluded in *Boyer* that "no objectively reasonable expectation of privacy exists when a wildlife enforcement officer checks for hunting and fishing licenses in open season near game habitat, inquires about game taken, and requests to inspect game in the field." *Boyer*, ¶ 24. Our conclusion was premised upon the licensing requirements establishing an angler's acknowledgment of the prospect that there will be at least some governmental intrusion into their sporting activities. We rejected Boyer's claim that he had a legitimate expectation of privacy in his catch, concluding, instead, that the authorization provided to wardens to inspect game pursuant to § 87-1-502(6), MCA, established that Boyer's subjective expectation of privacy in his catch was not one society was willing to recognize as objectively reasonable. Thus, *Boyer* informs us only with respect to the Fourth Amendment and Article II, Section 10 of Montana's Constitution, establishing that a detention to inspect fish does not require individualized suspicion or a justification. *Boyer* does not address custody of a suspect and the requirements of *Miranda*, it addresses the justification for the search and seizure of fish.

has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980); *INS v. Delgado*, 466 U.S. 210, 228, 104 S. Ct. 1758, 1769 (1984); *see Munson*, ¶ 23. Nonetheless, a Fourth Amendment seizure does not necessarily render a person in custody for purposes of *Miranda*. For example, the Supreme Court has specifically held that a traffic stop constitutes a Fourth Amendment seizure. *See Delaware v. Prouse*, 440 U. S. 648, 653, 99 S. Ct. 1391, 1396 (1979). Such stops are not, however, necessarily custodial for purposes of *Miranda*. *Berkemer*, 468 U.S. at 440, 104 S. Ct. at 3150. The *Berkemer* Court noted the distinction between a Fourth Amendment seizure and *Miranda*'s custody requirement when it explained "the threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize has little to do with the strength of an interrogating officer's suspicions." *Berkemer*, 468 U.S. at 435, 104 S. Ct. at 3148, n.22.

¶39 A number of courts have recognized the important distinction between a Fourth Amendment seizure and *Miranda*'s custody requirement, and have held that while a stop at a fixed checkpoint may be a Fourth Amendment seizure, it is not custodial for purposes of *Miranda*. *See United States v. Fernandez-Ventura*, 132 F. 3d 844, 846 (1st Cir. 1998), and *United States v. Moya*, 74 F. 3d 1117, 1120 (11th Cir. 1996). The critical distinction between a seizure in the Fourth Amendment sense and custody in the *Miranda* sense, is that custody arises only if the restraint on freedom is a certain degree–the degree associated with a formal arrest. *Berkemer*, 468 U.S. at 440, 104 S. Ct. at 3150.

24

Accordingly, the context of the police encounter, such as whether there has been a formal arrest, is significant in determining whether a person is in custody for purposes of *Miranda*.

¶40    Of the several types of police-citizen encounters–voluntary cooperation, a *Terry* investigatory detention, and a formal arrest–*Miranda*'s custody requirement is triggered only in situations associated with a formal arrest.  While the unique context of a checkpoint allows wardens to stop, briefly detain, and question individuals without any individualized suspicion that the individuals are engaged in criminal activity, such checkpoints do not necessarily trigger the custody requirement of *Miranda*.  The protections afforded persons at checkpoints pursuant to the Fourth Amendment to the United States Constitution and Article II, Sections 10 and 11 of the Montana Constitution lie in the appropriate limitations on the scope of the stop.  See *United State v. Martinez-Fuerte*, 428 U.S. 543, 566-67, 96 S. Ct. 3074, 3087 (1976).  During a routine checkpoint stop, law enforcement may ask questions and conduct an investigation reasonably related to their duties, but any extended detention of an individual beyond the scope of the routine checkpoint violates the Fourth Amendment, unless *justification* for extension of the detention is supported by reasonable suspicion, consent, or probable cause.  In contrast, the Fifth Amendment protections established in *Miranda* apply *anytime* an individual is in custody and is being interrogated, regardless of the level of Fourth Amendment justification.

¶41    Section 87-1-207, MCA, allows FWP to "establish checking stations when considered necessary to inspect licenses of hunters and anglers to inspect any game

animals, fish, or fur-bearing animals in the possession of hunters and anglers." Thus, at a fixed checkpoint, FWP wardens may stop, briefly detain, and question individuals without any individualized suspicion that the particular individual is engaged in criminal activity. While a seizure has occurred, the requirements of *Miranda* are not implicated because the individual is not in custody, akin to a formal arrest. *Berkemer*, 468 U.S. at 436-39, 104 S. Ct. at 3148-49; *Elison*, ¶ 29. Although a *Terry*-type stop similarly does not invoke *Miranda* requirements, a *Terry*-type stop, in contrast to a checkpoint stop, requires that law enforcement have articulable reasonable suspicion that an individual is involved in criminal activity. Articulable suspicion is the justification for a *Terry*-type stop; § 87-1-207, MCA, combined with *Boyer*'s rationale, is the justification for a checkpoint stop.

¶42   Here, in my opinion, Maile's encounter with seven wardens over an extended period of time in which the State concedes an interrogation took place, exceeded the parameters of the detention authorized by § 87-1-207, MCA. Maile was detained for nearly 78 minutes at the checkpoint, and wardens followed up their initial investigation with a four hour visit to Maile's home. In total, Maile's encounter with law enforcement lasted 5 hours. These facts, in conjunction with the State's concession that there was an interrogation, demonstrate that the scope of the stop exceeded the brief detention and inquiry authorized by § 87-1-207, MCA. However, whether justification for the extension was based upon Maile's voluntary cooperation, the development of reasonable suspicion, or even probable cause does not resolve the question of whether Maile was in custody. Therefore, although I would conclude that the encounter exceeded the

26

parameters of a checkpoint stop authorized by § 87-1-207, MCA, such a conclusion does not dictate a determination that Maile was in custody for purposes of *Miranda*. The Court's inquiry on this point, whether Maile was in custody akin to a formal arrest, is correct and I concur with the Court's conclusion that Maile was never under "formal arrest" and thus cannot be deemed in custody. While the record supports that there was an extension of the detention initially authorized by § 87-1-207, MCA, and an interrogation as the State concedes, the record does not support a conclusion that Maile was under formal arrest or in custody for purposes of *Miranda*.

¶43 Accordingly, I disagree with the Court's analysis, particularly our failure to acknowledge the *context* of this stop–a fixed checkpoint pursuant to § 87-1-207, MCA—and to blend the justifications for a Fourth Amendment seizure with *Miranda*'s Fifth Amendment neutralizing protections. Section 87-1-207, MCA, is the only justification for Maile's stop and the context within which our *Miranda* custodial analysis must begin. Any extension of the checkpoint detention beyond what was reasonable for wardens to dispel suspicions of wrongdoing should have been supported by Maile's voluntary cooperation, reasonable suspicion, or probable cause. The presence or absence of adequate justification, however, is not before the Court. Nonetheless, assuming the absence of any of these justifications and therefore a corresponding Fourth Amendment violation, *Miranda*'s Fifth Amendment neutralizing protection is still not implicated when the suspect is not in custody. *See Berkemer*, 468 U.S. at 442, 104 S. Ct. 3141 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the

27

suspect's position would have understood his situation."). The existence of probable cause does not mandate that law enforcement place a suspect under formal arrest; a suspect does not have a right to be arrested. Concomitantly, the existence of probable cause does not mandate that *Miranda* warnings be given absent custody and interrogation. Although Maile's detention exceeded the checkpoint stop authorized by § 87-1-207, MCA, by both its length and the wardens' extensive interrogation, a conclusion that Maile was in custody *at any time* during the extended detention period cannot be supported by the record. Even assuming Maile was seized for an extended period of time without Fourth Amendment justification, there simple were no circumstances indicating Maile was ever subject to a formal arrest during his detention.

¶44    I agree with the ultimate result reached by the Court on Issue One; however, I would apply the foregoing analysis in reaching the result. Accordingly, I specially concur on Issue One. I would not reach Issue Two and therefore I dissent from the Court's decision to address the merits.

/S/ LAURIE McKINNON